Jimmy F. **BEARE**, Linda W. Colvin, Erasmo T. Saeng and Raymundo Martinez, Plaintiffs,

v.

Preston **SMITH**, as Governor of the State of Texas, Martin Dies, Secretary of the State of Texas, and Richard D. Magee, as Voting Registrar of Nueces County, Texas, Defendants.

Civ. A. No. 70–C–42.

United States District Court, S. D. Texas, Corpus Christi Division.

Jan. 7, 1971.

Yancey White, Allison, Maddin, White & Brin, Corpus Christi, Tex., Edwards & DeAnda, Corpus Christi, Tex., for plaintiffs.

W. O. Shultz, Asst. Atty. Gen., James McCoy, Asst. Atty. Gen., Austin, Tex., Franklin L. Smith, County Atty., Nueces County, C. Edwin Prichard, Corpus Christi, Tex., for defendants.

Before INGRAHAM, Circuit Judge, SINGLETON and SEALS, District Judges.

SINGLETON, District Judge.

For many years prior to the decision in United States v. Texas, 252 F.Supp. 234 (W.D.Tex.1966), aff'd, 384 U.S. 155, 86 S.Ct. 1383, 16 L.Ed.2d 434 (1966), Texas required its residents to pay an annual poll tax as a prerequisite to their voting in Texas elections. In the wake of that decision declaring the poll tax to be constitutionally impermissible, the legislature of Texas proposed, and the people ratified, an amendment to the Texas Constitution, providing for an-

nual registration of Texas voters.[1] This suit attacks the constitutionality of that provision on the basis of the fourteenth and twenty-fourth amendments to the constitution. Also, this suit seeks to void on the same basis the annual registration provisions of the Texas statutes. Under Texas statutes those who wish to vote in any given year must register each year. The registration period begins on October 1 and ends on January 31 of the following year, a period of four months.[2] For reasons expressed below, we have concluded that the challenged provisions must be voided.

The plaintiffs in this suit are each residents of different Texas counties. Each one of them is a qualified voter of his home county in every respect. Each plaintiff inadvertently failed to register as required by law. Each attempted to register for the 1970 election year after January 31, 1970, but no application tendered by any of the plaintiffs was accepted, the reason given in each instance being that the registration books had been closed for the year. Defendants are all state officials charged with the responsibility of enforcing the provisions drawn into question. Jurisdiction is predicated upon 28 U.S.C. § 1343, and a hearing on the merits of the complaint was held on April 29, 1970, before a panel of three judges as demanded by 28 U.S.C. § 2281.

Article VI, Section 2 of the Texas Constitution in its material provisions provides:

"Every person * * * who shall have attained the age of twenty-one (21) years and who shall be a citizen of the United States and who shall have resided in this State one (1) year next preceding an election and the last six (6) months within the district or county in which such person offers to vote, shall be deemed a qualified elector; provided, however, that before offering to vote at an election a voter shall have registered annually, but such requirement for registration

shall not be considered a qualification of an elector within the meaning of the term 'qualified elector' as used in any other Article of this Constitution in respect to any matter except qualification and eligibility to vote at an election."

Implementation of this constitutional mandate is found in Article 5.11a, V.A. T.S. Election Code, which provides:

"Voters shall register annually. The first period for registration under this law shall begin in each county immediately upon the effective date of this Section and shall end on the thirty-first day of January following; provided, however, that if this Section takes effect after January 1, 1967, as the result of a court decision, the registration period shall continue through the thirtieth day following the effective date. In each year thereafter, the period for registration shall be from the first day of October through the thirty-first day of January following. The first registration hereunder shall entitle the registrant, if otherwise qualified, to vote at elections held between the first day of February following the registration period and the last day of February of the following year. Each annual registration thereafter shall entitle the registrant, if otherwise qualified, to vote at elections held during the period of one year beginning on the first day of March following the registration period."

The main thrust of plaintiffs' contentions is that the cumulative effect of the registration period, being only four months in duration and ending more than nine months prior to the November general elections, and the annual registration requirement is to impose upon the voting public unconstitutional obstacles upon the exercise of the franchise.

At the outset, it must be said that the right to vote is a right which

---

1. Art. VI, Section 2, V.A.T.C.

2. Art. 5.11a, V.A.T.S. Election Code.

is at the heart of our system of government. Parenthetically, it must be said that there is also a right not to vote. The really important aspect of this problem is that any restrictions on or impediments to this right should be legislatively imposed solely and only to protect a compelling state interest and any other restrictions on or impediments to this right cannot meet constitutional standards. That government should derive its powers from the consent of the governed is one of the basic tenets of the Declaration of Independence. This right is one which has been jealously guarded by the judiciary over the years. Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right." *Id.* at p. 17, 84 S.Ct. at p. 535. As was said in Reynolds v. Sims, 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506, "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." It is thus undeniably true that voting rises above the level of being merely a privilege. A citizen's participation in the electoral process is, instead, a constitutionally protected liberty too precious, too fundamental to be burdened or conditioned unreasonably. Harper v. Virginia State Board of Elections, 383 U.S. 663, 670, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966). *See also* Ex Parte Yarbrough, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274 (1884); United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941); Doty, "The Texas Voter Registration Law and the Due Process Clause," 7 Hou.L.Rev. 163 (1969).

Neither can it be contended that the question is purely political in nature and consequently plaintiffs should seek legislative and not judicial relief. Granted, "we do not sit as a super-legislature to determine the wisdom, need, and propriety of laws that touch economic problems, business affairs, or social conditions." Griswold v. Connecticut, 381 U.S. 479, 482, 85 S.Ct. 1678, 1680, 14 L.Ed.2d 510 (1965). In this instance, however, there is clearly a justiciable controversy. Moore v. Ogilvie, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969); Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); Reynolds v. Sims, *supra;* Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

"When a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right." Gomillion v. Lightfoot, 364 U.S. 339, 347, 81 S.Ct. 125, 130, 5 L.Ed.2d 110 (1960).

It is beyond doubt that the present Texas voter registration procedures tend to disenfranchise multitudes of Texas citizens otherwise qualified to vote. The present system, being a direct descendant of the poll tax, Gonzales v. Stevens, 427 S.W.2d 694 (Tex.Civ. App.—Corpus Christi 1968, n. r. e.), has all of the features which the poll tax system had except the payment of an annual fee. The closing of registration so far in advance of the general election, in the years one is held, perpetuates the obstacles the twenty-fourth amendment prohibits. The evidence presented in this case shows that if the annual registration obstacle were removed over one million Texans would be eligible to vote that would not have been eligible with that requirement. Without annual registration, the number of persons who would actually vote would be increased by about the same number. Similarly, if registration were open until a month before the general election and had been

open for the preceding eight months, voter registration would increase by over one million. In short, the present system closes the election hall door to a million citizens.

Particularly enlightening is the research done by Dr. Allen Shinn, Assistant Professor of Government, University of Texas at Austin. In a comprehensive survey of voter participation in various states, Dr. Shinn found that the average registration figure for those states with permanent registration was 78.1% of the potential qualified electorate, and the average figure for those states requiring annual registration as of 1968, including Texas, Alabama, South Carolina, and the District of Columbia, was 59.0%. Thus, should Texas change to a permanent registration system, there would be a 19.1% increase in registration, all else being equal. This amounts to an increase from 4,173,000 people registered in 1968 to 5,280,000 people who could have voted but for annual registration.

Voter turnout for elections in states with permanent registration systems was found to be 63.1%. States which did not have permanent registration in 1968 had a 48.1% participation rate. Thus, Texas would have realized in 1968 a 14.6% increase or about 1,170,000 additional persons voting.

Dr. Shinn also testified that registration would increase about 2.7% for each month closer to the general election that the closing date for registration is moved. This means that when registration is closed thirty days prior to the general election, having been open for the eight months preceding that closing date, 1,000,365 additional persons would have been registered had the change been made in 1968.

Dr. Shinn's finding with respect to the registration closing date is in accord with studies made by Dr. Stanley Kelley, Professor of Political Science, Princeton University. *See Kelley, et al,* "Registration and Voting: Putting

First Things First," 61 Am.Pol.Sci.R. 359 (June 1967). Dr. Kelley found that:

"[E]xtending the closing date for registration from, say, one month to one week prior to election day would tend to increase the percentage of population registered by about 3.6 per cent. . For politicians, varying the closing date for registration would thus appear to be a very effective way in which to manipulate the size of the potential electorate.

"Why this should be so can be suggested here, if not demonstrated. A longer period in which one may register increases considerably the convenience of doing so, of course, but we doubt that that is all there is to the matter. A late closing date for registration also probably tends to increase rates of registration because it allows the campaign to serve as a reminder to weakly motivated voters that they need to register and as a stimulus to find out from others how they can do so * * *. '* * * if all the adult citizens * * * had been properly informed, 10 percent more of them would have registered.' " (61 Am.Pol.Sci.R. 367).

Further evidence that periodic re-registration and the remote registration closing date are disenfranchising characteristics of the present system can be found in the studies of Dr. Walter Burnham, Professor of Political Science, Washington University (St. Louis). Statistically, Dr. Burnham testified, voter turnout between 1880 and 1896 was about 15% to 20% greater in five representative states than it was between 1952 and 1968. *Kelley, supra,* explained the significance of that fact in these terms:

"In the latter half of the nineteenth century, when the turnout of eligible voters was between 75 and 85 percent, voters were not required to register in many parts of the country, and in many places where they were, there were systems of automatic registration. In the period from 1896 to 1924, when the turnout declined almost

steadily, state after state enacted registration laws which typically required registration annually and in person of all voters in the nation's large cities; the registration procedures of this era have been described by one student of registration practices as 'expensive, cumbersome, and inconvenient to the voter.' In the period from 1924 until the present, during which the turnout has generally risen, more and more states have been liberalizing their registration laws, particularly as these apply to the larger cities. In short, turnout in presidential elections in the United States may have declined and then risen again, not because of the changes in *interest* of voters in elections, but because of changes in the *interest* demanded of them." (61 Am. Pol.Sci.R. 374).

The conclusions of Professors Shinn, Burnham, and Kelley are supported by testimony of Dr. Clifton McClesky, Professor of Government, University of Texas at Austin, and in the testimony of Martin Dies, presently the Secretary of State of Texas.

■ Defendants contend that the purposes of these provisions are to prevent election fraud and to insure that only those citizens which have the greatest amount of interest in elections will vote. Defendants further contend that Article VI, Section 2, V.A.T.C. and Article 5.11a, V.A.T.S. Election Code are reasonably related to these purposes. The reasonable relationship test, traditionally applied to determine whether a particular statute denies equal protection, has no bearing on this suit. Since 1965, the Supreme Court has held that statutes which place limitations upon the right to vote can be upheld only upon a showing

that they are necessary to promote a compelling state interest.[3] City of Phoenix v. Kolodziejski, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970); Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969); Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). In *Kramer, supra,* a New York statute requiring that voters in school elections either own real property or have a child in school was invalidated as not necessary to the promotion of a compelling state interest. There, the logic behind the compelling state interest test was presented in the following terms:

"[T]he deference usually given to the judgment of legislators does not extend to decisions concerning which resident citizens may participate in the election of legislators and other public officials. Those decisions must be carefully scrutinized by the Court to determine whether each resident citizen has, as far as is possible, an equal voice in the selections. Accordingly, when we are reviewing statutes which deny some residents the right to vote, the general presumption of constitutionality afforded state statutes and the traditional approval given state classifications if the Court can conceive of a 'rational basis' for the distinctions made are not applicable. See Harper v. Virginia [State] Bd. of Elections, 383 U.S. 663, 670, 86 S.Ct. 1079, 1083, 16 L.Ed.2d 169 [174] (1966). The presumption of constitutionality and the approval given 'rational' classifications in other types of enactments are based on an assumption that the institutions of state government are structured so as to represent fairly all the people. However,

3. The development of the compelling state interest test can be traced to Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942), where, in declaring a compulsory sterilization statute unconstitutional, the Supreme Court gave "strict scrutiny" to the classification which the state had made. Other instances of its application include Shapiro v. Thompson,

394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), the right to travel; McLaughlin v. Florida, 379 U.S. 184, 85 S. Ct. 283, 13 L.Ed.2d 222 (1964), racial classifications; and Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), racial classifications and the right to marry.

when the challenge to the statute is in effect a challenge of this basic assumption, the assumption can no longer serve as the basis for presuming constitutionality. And, the assumption is no less under attack because the legislature which decides who may participate at the various levels of political choice is fairly elected. Legislation which delegates decision making to bodies elected by only a portion of those eligible to vote for the legislature can cause unfair representation. Such legislation can exclude a minority of voters from any voice in the decisions just as effectively as if the decisions were made by legislators the minority had no voice in selecting." (395 U.S. 627, 89 S.Ct. 1890, 23 L.Ed. 2d 589–590.)

In Cipriano v. City of Houma, *supra,* the compelling state interest test was applied in invalidating a Louisiana statute limiting the franchise in special bond elections to property taxpayers. In City of Phoenix v. Kolodziejski, *supra,* the same approach was taken in nullifying a similar requirement for general obligation bonds. In yet another case, Evans v. Cornman, 398 U.S. 419, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1970), a Maryland practice of denying residents living in federal enclaves the right to vote, a practice based on the proposition that such persons were not residents of Maryland, was held unnecessary to the promotion of a compelling state interest.

■ It must always be kept in mind that the power of a state to determine qualifications to vote must be exercised precisely and circumspectly so as to limit the franchise no more than is necessary to effectuate the state's interest. United States v. Alabama, 252 F. Supp. 95 (M.D.Ala.1966). As Mr. Justice Marshall said, dissenting in Hall

v. Beals, 396 U.S. 45, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969):

> "But if it was not clear in 1965 [referring to Drueding v. Devlin, 234 F.Supp. 721 (D.Md.1964), aff'd 380 U.S. 125, 85 S.Ct. 807, 13 L.Ed.2d 792 (1965)], it is clear now that once a State has determined that a decision is to be made by popular vote, it may exclude persons from the franchise only upon a showing of a compelling interest, and even then only when the exclusion is the least restrictive method of achieving the desired purpose." (396 U.S. 52, 90 S.Ct. 203).

Particularly pertinent to the present case are Hadnott v. Amos, 320 F.Supp. 107 (N.D.Ala.1970) and Blumstein v. Ellington, C.A. 5815 (M.D.Tenn. Aug. 31, 1970). In each of those cases, certain state residency requirements, on behalf of which the state in each case made arguments similar to those made here, were held unnecessary to promote a compelling state interest.[4] Thus, we have no hesitation in concluding that Article VI, Section 2, V.A.T.C. and Article 5.11a, V.A.T.S. Election Code deny equal protection unless the state can demonstrate that they are necessary to promote a compelling state interest. That showing has not been made here, and we do not perceive that such a showing can be made at all.

■ One such interest suggested by the state as compelling which the provisions in question are said to promote is the purity of the ballot. In other words, the state contends that those who overcome the annual hurdle of registering at a time remote to the fall elections will more likely be better informed and have greater capabilities of making an intelligent choice than those who do not care enough to register. This is a claim

---

4. Other recent election cases in which the compelling state interest standard has been employed include Lester v. Board of Elections, 319 F.Supp. 505 (D.D.C.1970); Kollar v. City of Tucson, 319 F.Supp. 482 (D.Ariz.1970); Thomas v. Mims, 317 F.Supp. 179 (S.D.Ala.1970); Brenner v. School District of Kansas City, 315 F. Supp. 627 (W.D.Mo.1970); Socialist Workers Party v. Rockefeller, 314 F. Supp. 984 (S.D.N.Y.1970); Westbrook v. Mihaly, 87 Cal.Rptr. 839, 471 P.2d 487 (Cal.1970).

which cannot be accepted. Evans v. Cornman, *supra;* Kramer v. Union Free School District, *supra.* A state may not dilute a person's vote to give weight to other interests, *see, e. g.,* Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), much less deny it completely to thousands of Texans who fail to comply with the existing registration statutes.

Assuming for the sake of argument, however, that the challenged provisions were necessary to promote a valid state interest, we entertain serious doubts as to whether it is sufficiently compelling. "Participation in decisions affecting one's life and the community contributes to the growth of the individual and tends to promote the stability of the political system by enhancing its legitimacy. In this day and age, with many explosive forces at work, we should pay more attention to the stability acquired by justly giving to all qualified citizens easy access to the ballot." May, "The Texas Voter Registration System," 16 Public Aff. Com. No. 4, p. 4 (July 1970).

Another compelling state interest which the state contends the challenged provisions support is that of preventing election fraud. We do not question that this is a legitimate state interest and that it is compelling. What we do question is whether the present voting system is necessary to promote that interest. There must be other effective safeguards against fraud than requiring annual voter registration and to close the registration period at a time when those desiring to register do not even know for sure who the candidates are and what

the issues might be. We volunteer our opinion that the citizens of Texas would recommend the expenditure of tax funds by the legislature to again study this problem and to arrive at some other system which would allow full participation by all citizens eligible under reasonable statutes and which would in some manner shorten the period between the registration cutoff date and the date of the general election and at the same time protect the purity of the ballot and insure against fraudulent votes. Certainly, annual registration and the January 31 cutoff date is not necessary in any way to prevent fraud and does not encourage full participation by the citizens of Texas. Blumstein v. Ellington, *supra.*

In concluding that the challenged provisions in issue here are beyond the bounds of constitutional limitations, we have studied the recent decision by the Supreme Court in Oregon v. Mitchell, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (Dec. 21, 1970), and the companion cases included in that opinion. There, the majority held that Congress is endowed with power to enfranchise eighteen-year-olds for all federal elections, to set residency requirements and provide for absentee balloting in elections for presidential and vice presidential electors, and to prohibit the use of literacy tests or other devices used to discriminate against voters on account of their race in both federal and state elections.[5] There are passages from certain of the various opinions entered in Oregon v. Mitchell, *supra,* making reference to the power of the states to determine the qualifications of their own

5. Mr. Justice Black wrote the opinion expressing these specific holdings. Justices Douglas, Brennan, White, and Marshall agreed with Justice Black that Congress could permit eighteen-year-old citizens to vote in federal elections, but dissented from his view that Congress could not extend the franchise to eighteen-year-old citizens in state and local elections. On the other hand, The Chief Justice and Justices Harlan, Stewart and Blackmun agreed that Congress could not confer suffrage upon eighteen-year-old citizens in state and local elections but dissented from Justice Black's holding that it could do so in federal elections. All the Justices agreed that Congress could ban literacy tests in all elections and all of them, except Mr. Justice Harlan, agreed that Congress could set residency requirements and provide for absentee balloting in elections for presidential and vice presidential electors.

voters for state and local offices.[6] That the states have this power is beyond cavil and is certainly not herein denied. We hold only that the power of the states to set voter qualifications is subject to the fourteenth amendment. This holding is strengthened by the separate opinion of Mr. Justice Brennan in which he said:

"But it is now settled that exercise of this power, like all other exercises of state power, is subject to the Equal Protection Clause of the Fourteenth Amendment. Carrington v. Rash [380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675] supra; Harper v. Virginia [State] Board of Elections, 383 U.S. 663 [86 S.Ct. 1079, 16 L.Ed.2d 169] (1966); Kramer v. Union Free School District, 395 U.S. 621 [89 S.Ct. 1886, 23 L.Ed.2d 583] (1969); Evans v. Cornman, 398 U.S. 419 [90 S.Ct. 1752, 26 L.Ed.2d 370] (1970). * * *

"The right to vote has long been recognized as a 'fundamental political right, because preservative of all rights.' Yick Wo v. Hopkins, 118 U.S. 356, 370 [6 S.Ct. 1064, 30 L.Ed. 220] (1886); see Reynolds v. Sims, 377 U.S. 533, 562 [84 S.Ct. 1362, 12 L.Ed. 2d 506] (1964); Williams v. Rhodes, 393 U.S. 23, 31 [89 S.Ct. 5, 21 L.Ed.2d 24] (1968). 'Any unjustified discrimination in determining who may participate in political affairs undermines the legitimacy of representative government.' Kramer v. Union Free School District, 395 U.S., at 626 [89 S.Ct., at 1889]. Consequently, when exclusions from the franchise are challenged as violating the Equal Protec-

tion Clause, judicial scrutiny is not confined to the question whether the exclusion may reasonably be thought to further a permissible interest of the State. Cf. Metropolitan [Casualty Ins.] Co. v. Brownell, 294 U.S. 580, 583–584 [55 S.Ct. 538, 79 L.Ed. 1070] (1935). 'A more exacting standard obtains.' Kramer v. Union Free School District, 395 U.S., at 633 [89 S.Ct., at 1892]. In such cases, 'the Court must determine whether the exclusions are necessary to promote a compelling state interest.' *Id.*, at 627 [89 S.Ct., at 1890]; Cipriano v. City of Houma, 395 U.S. 701, 704 [89 S.Ct. 1897, 23 L.Ed.2d 647] (1969)."

Here, we have found from the evidence presented that the annual registration requirement and the remoteness of the closing date for voter registration to the general election, in the years when one is held, operate to disqualify from voting over a million Texans who could otherwise be permitted to vote. These restrictions are not necessary to promote a compelling state interest and, therefore, are constitutionally impermissible as volitive of the Equal Protection Clause of the fourteenth amendment.

For the reasons expressed herein, we hold that that provision of Article VI, Section 2, V.A.T.C. relating to the annual registration of voters and Article 5.11a, V.A.T.S. Election Code are constitutionally untenable and are therefore null, void, and of no effect.

■ In their prayer for relief, plaintiffs have asked that we enjoin any further enforcement and administration of Article VI, Section 2, V.A.T.C. and

---

6. We turn to Mr. Justice Black for the view that:

"It is obvious that the whole Constitution reserves to the States the power to set voter qualifications in state and local elections, except to the limited extent that the people through constitutional amendments have specifically narrowed the powers of the States.

* * * * *

"[I]t cannot be successfully argued that the Fourteenth Amendment was intended to strip the States of their power, carefully preserved in the orig-

inal Constitution, to govern themselves." See 400 U.S. pp. 125–127, 91 S. Ct. p. 265, 266.

To the same effect see the separate opinion of Mr. Justice Brennan, 400 U.S. p. 229, 91 S.Ct. 317. However, in footnote 10, 400 U.S. page 127, 91 S.Ct. page 266, Mr. Justice Black delineates the exact question confronting the Court in that case:

"The crucial question here is not who is denied equal protection, but rather which political body, state or federal, is empowered to fix the minimum age of voters."

Article 5.11a, V.A.T.S. Election Code. with respect to this request, it is appropriate to say that while the validity of the challenged provisions is a question calling for a judicial determination, the decision of what to put in their place is, as previously stated, a question calling for legislative determination. When the legislature speaks on this subject it can, within constitutional limitations as discussed in this opinion, provide for the qualification of voters in state and local elections and, to some extent not inconsistent with previous Supreme Court opinions on this subject and specifically the recent opinion in Oregon v. Mitchell, *supra*, in federal elections. Therefore, no injunction will issue, and we will retain jurisdiction of this case and afford the Texas Legislature the full opportunity to correct what we have found and held to be constitutional deficiencies in the present system.

The clerk of this court is directed to file this opinion and to send true copies to the counsel of record. Within thirty (30) days after this opinion is filed, counsel for plaintiff will have drafted a final decree to be entered by this court and will submit it to the court after having obtained approval as to form by counsel for defendants.