**James Earl FERGUSON et al.,
Plaintiffs,**

**v.**

**The Honorable John Bell WILLIAMS,
Governor of the State of Missis-
sippi, et al., Defendants.**

**No. GC 7173.**

United States District Court,
N. D. Mississippi,
Greenville Division.

Aug. 30, 1971.

J. Wesley Watkins, III, Greenville, Miss., Barry H. Powell, Jackson, Miss., for plaintiffs.

William A. Allain, Asst. Atty. Gen., Jackson, Miss., for defendants.

Before CLARK, Circuit Judge, and KEADY and SMITH, District Judges.

KEADY, District Judge:

This case presents the basic question of whether Mississippi's four-month registration requirement for voting in state and local elections as provided by its state constitution,[1] and statute,[2] violates the Equal Protection Clause of the Fourteenth Amendment. A second issue raised is whether this registration requirement abridges the right to vote of 18 to 20 year old Mississippi citizens in contravention of the Twenty-sixth Amendment.[3]

In their original complaint filed on July 8, 1971, plaintiffs began this suit as a class action only on behalf of Mississippi residents between 18 and 20 years of age who had failed to register by July 2, 1971, and alleged that they were allowed only two days after the adoption of the Twenty-sixth Amendment in which to register so as to qualify to vote in the 1971 statewide primary and general elections. Defendants named in the action were the State Board of Election Commissioners, consisting, by statute, of the governor, secretary of

1. Miss. Constitution (1890), Art. 12, § 251: Electors shall not be registered within four months next before any election at which they may offer to vote; but appeals may be heard and determined and revision take place at any time prior to the election; and no person who, in respect to age and residence, would become entitled to vote within the said four months, shall be excluded from registration on account of his want of qualification at the time of registration.

2. Miss.Code Ann. § 3235.

3. Twenty-sixth Amendment to the United States Constitution: "The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." This amendment became effective on June 30, 1971, upon its ratification by three-fourths of the states of the Union. Ohio on that date became the 38th state to ratify the amendment.

state and attorney general, and the circuit clerk who is also the county registrar, and election commissioners of Washington County. The county officials were joined as class defendants representing county election officials in all of the state's counties.

By statute, the date of the 1971 first primary of a political party to nominate candidates for state and county offices (exclusive of judges) fell on August 3, with second primary on August 24,[4] and general election to follow on November 2.[5]

Plaintiffs requested the convening of a three-judge district court pursuant to 28 U.S.C. §§ 2281 and 2284 to enjoin, because of federal unconstitutionality, the enforcement of the state's constitutional and statutory requirements for four months registration in advance of the next general election. Plaintiffs on July 9 applied to a single judge of this court for a restraining order to extend the times for registering to vote in the August primary until July 20 and for the general election until October 20. This relief was refused.

On July 21 plaintiffs amended their complaint by broadening the plaintiffs' class to include all Mississippi residents

otherwise qualified to vote in the 1971 state primary and general elections but for the fact that they failed to register before the July 2 deadline.

On August 5 a duly constituted three-judge court convened and conducted an evidentiary hearing. It received a stipulation of facts, oral and documentary evidence and heard arguments submitted by both sides.

The essential facts are undisputed. The named plaintiffs are qualified voters except for the fact that they failed to register on or before July 2. The circuit clerk of each county who serves as county registrar of elections initially determines if a person offering to register is qualified to do so and registers anyone so qualified. The state's aforementioned constitutional and statutory provisions concerning registration, as interpreted by the Mississippi Supreme Court [6] and the state's attorney general and applied in practice throughout the state, provide that while a person may register at any time, he cannot vote in the state's general election unless he has registered at least four months prior thereto; that such registration is effective if he meets age and residency re-

4. Miss.Code Ann. § 3109: "The first primary shall be held on the first Tuesday after the first Monday of August preceding any regular election; and the second primary shall be held three weeks thereafter."

5. Miss.Code Ann. § 3237: " * * * A general election shall be held in the several counties on the first Tuesday after the first Monday in November, in the year 1931; and every four years thereafter.
(We parenthetically note that Chap. 506 (H.B. 362) and Chap. 508 (H.B. 363), General Laws of 1970, which attempted to abolish primary elections and provide preferential general elections did not receive approval by the Attorney General of the United States, pursuant to the Voting Rights Act of 1965, 42 U.S.C. § 1973c, are in a state of suspended animation and not applicable to the 1971 elections. Thus, the state's statutes regulating primary and general elections which preexisted the 1970 legislation remain in force. Evers v. State Board of

Election Commissioners, 327 F.Supp. 640 (S.D.Miss.1971, 3-judge court)).

6. Bew v. State, 71 Miss. 1, 13 So. 868, 869 (1893):
"Section 251 of the constitution declares that 'electors shall not be registered within four months next before any election at which they may offer to vote;' not that registration shall not be had within four months of an election, but it must be one at which the elector offers to vote. * * * There is nothing in the constitution inhibiting being registered at any time, even on the day of an election, but it does declare, in effect, that, although registered, one shall not vote at an election held within four months of his registration."
§ 251 of the constitution, applicable to all elections, entitles one applying to register four months or more before an election to be registered if he shall meet the residency requirement by the date of the election although not at time of registration. State ex rel. Kiersky v. Kelly, 81 Miss. 1, 32 So. 909 (1902).

quirements as of the date of election although not at time of registration; and that he may vote in the intervening primary elections to nominate candidates for the general election only if he has registered four months or longer before the general election.

The November 1971 general elections in Mississippi are for all major state and county elective offices, including governor, lieutenant governor, attorney general, secretary of state, superintendent of public education, all members of the state legislature and all major county elective offices, including boards of supervisors, sheriffs, clerks of the circuit and chancery courts, county and district attorneys, justices of the peace and constables. Since these elections are for four-year terms, no further elections for such offices shall occur in the next four years, except for special elections called to fill vacancies.

According to the 1970 official census, 1,373,145 persons 18 years of age or more reside in the state, including 130,180 in the 18 through 20 age bracket. 1,084,-340 persons, or 79% of the state's potential voters, are currently registered as qualified voters, and this number includes 70,300 persons in the 18 to 20 year group who timely registered to participate in this year's state primary and general elections. Thus, an estimated 288,805 persons, including 59,880 who are 18 to 20 years old, failed to reg-

ister by the July 2 deadline, which renders them ineligible to vote in the August primary and November elections. There is no data before the court to show how many of these persons failing to register would meet the state's other requirements for voter eligibility.

In Mississippi, the presently effective qualifications for voting in state and local elections, apart from registration, are: (1) United States' citizenship; (2) being 18 years of age or more (by force of the 26th Amendment); (3) residency in the state and county for one year and six months in the election precinct; and (4) not having been convicted of enumerated major crimes.[7] Of course, the state's literacy test provided by Art. 12, § 244 of its constitution has been suspended by the Voting Rights Act of 1965, and extended in 1970, 42 U.S.C. § 1973b.[8] Plaintiffs make no attack upon any of the state's qualifications for franchise other than the four-months registration requirement.

Mississippi has a system of permanent registration of voters[9] which is uniformly administered throughout the entire state. Registration books are maintained in the office of the circuit clerk of each county, in his capacity as voter registrar. This official is required to keep the registration books open at all times for registration by persons entitled to be registered, §§ 3211, 3212. Anyone denied an opportunity to regis-

---

7. Miss. Constitution, Art. 12, § 241, as ratified by the electorate on June 4, 1968, and inserted by proclamation of the secretary of state on June 13, 1968: "Every inhabitant of this State, except idiots and insane persons, who is a citizen of the United States of America, twenty-one (21) years old and upwards, who has resided in this State for one (1) year, and for one (1) year in the county in which he offers to vote, and for six (6) months in the election precinct or in the incorporated city or town in which he offers to vote, and who is duly registered as provided in this article, and who has never been convicted of murder, rape, bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement or bigamy, is declared to be a qualified elector."

The court is informed that the foregoing constitutional amendment received requisite approval by the Attorney General of the United States under § V of the Voting Rights Act of 1965.

8. United States v. Miss., 256 F.Supp. 344 (S.D.Miss.1966). The constitutionality of the Voting Rights Act of 1965 was upheld in State of South Carolina v. Katzenbach, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966), and of Title I of the Voting Rights Act Amendment of 1970 in Oregon v. Mitchell, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970).

9. The county board of supervisors has power to order new registration when books are lost or destroyed, Code § 3221, or in case of confusion in the existing records, § 3222.

ter on the books may appeal from the registrar's decision of refusal to the county election commissioners, § 3224, and also obtain judicial review of an adverse determination by the commissioners, § 3227. Poll books for each election district are prepared from the registration records by the election commissioners who may be assisted by the registrar. These poll books show only the names of persons registering to vote four months or more prior to the next regular election, § 3232. At certain fixed times during the year,[10] the election commissioners, who render only part-time service, meet at the registrar's office to revise the registration and poll books by erasing therefrom the names of all persons erroneously thereon, or who have died, removed or become disqualified as electors from any cause, and also by adding the names of all persons determined to have been illegally denied registration by the registrar.

The election commissioners have only limited duties with respect to the primary of a political party. They are furnished with separate primary election poll books prepared by the registrar and they periodically revise or purge these separate records which contain names of registered voters in the same manner as they revise the general election poll books, § 3112. While the primary election poll books are required to be used in primary, and all voters' names should appear thereon, nevertheless anyone claiming he is entitled to vote in the primary and has been illegally denied registration, may vote separately and have his ballot thus considered by the county executive committee of the political party conducting the primary, § 3114. Any qualified elector, provided he satisfies the requirement of party loyalty, § 3129, may vote in the primary election if he has registered at least four months prior to the general election for the officers to be nominated at the primary and not lat-

er than one month prior to the date of the first primary, § 3130.

Candidates offering for a primary election must qualify not later than 60 days before such primary and if they are qualified electors, their names shall be placed on the ballot by the party officials, § 3118. The ballot for the general election shall contain the names of all candidates who either have been put in nomination by a political party or have filed qualifying petitions to run as independents; in either case all names must be submitted not later than 40 days prior to the date of the general election, § 3260.

The testimony disclosed that local election officials charged with the duty of preparing accurate poll books and making other appropriate arrangements, need from four to six weeks to make ready for an orderly election. Although the registration records remain open for registration throughout the year, the county registrars and their staff customarily experience an increased amount of registration activity as the cutoff date approaches. Many people have a tendency to procrastinate and defer the simple act of registering, some remaining apathetic until candidates begin announcing for public office. This influx of last-minute registrants places an increased load of work upon registrars and election commissioners to correctly classify and place the new registrants in the two sets of poll books. Extra help is often employed to assist the election officials in discharging their duties and preparing for elections.

Plaintiffs contend that a voting requirement for registering four months in advance of the general elections is, solely because of the length of time, violative of the Equal Protection Clause when tested either by the "compelling state interest" standard or by the "rational relation" standard; they assert,

10. On the first Monday in October preceding a general election and five days before any other election, § 3239, on the Tuesday after the third Monday of each March, § 3240, and on the third Monday in July preceding the primary election, § 3113.

additionally, that the state's allowing 18 to 20 year olds no more than two days in which to register is an unconstitutional abridgement by Mississippi of their right to vote in the 1971 elections. Defendants argue that the complaint, both originally and as amended, should be dismissed for lack of subject-matter jurisdiction because of failure to raise a substantial federal claim, and alternately the state's registration requirements pass constitutional muster.

■ We first hold that the action may be maintained by plaintiffs as a class action on behalf of all persons similarly situated, that is, citizens of the United States, 18 years of age or more, who would be qualified to vote in the 1971 state elections except for their failure to register four months prior to November 2, and that the suit is maintainable against local election officials as class defendants represented by the named registrar and county election commissioners. In both respects the prerequisites to class action as prescribed by Rule 23(a), (b) (2) and (3), F.R.Civ.P., are found to be present, and the action may proceed accordingly.

■■ We next hold that the federal court has subject-matter jurisdiction to examine allegations that state electoral standards violate the provisions of the federal Constitution, and the issues present a substantial federal claim for which the plaintiffs have standing to sue.[11]

■ As to the merits, we first examine plaintiffs' equal protection claim. The Supreme Court has long recognized that the "privilege to vote in a state is within the jurisdiction of the state itself, to be exercised as the state may direct, and upon such terms as to it may seem proper, provided, of course, no discrimination is made between individuals, in violation of the Federal Constitution." Pope v. Williams, 193 U.S. 621, 632, 24 S.Ct. 573, 575, 48 L.Ed. 817, 822 (1904).

Indeed, the states have "broad powers to determine the conditions under which the right of suffrage may be exercised, * * absent of course the discrimination which the Constitution condemns." Lassiter v. Northampton County Board of Elections, 360 U.S. 45, 51, 79 S.Ct. 985, 989, 3 L.Ed.2d 1072, 1076 (1959); Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965).

In *Lassiter*, the Court stated significantly:

"We do not suggest that any standards which a State desires to adopt may be required of voters. But there is wide scope for exercise of its jurisdiction. Residence requirements, age, previous criminal record (Davis v. Beason, 133 U.S. 333, 345–347, 10 S. Ct. 299, 301–302, 33 L.Ed. 637, 641, 642) are obvious examples indicating factors which a State may take into consideration in determining the qualifications of voters." 360 U.S. at 51, 79 S.Ct. at 990.

The foregoing principle was recently reaffirmed in Oregon v. Mitchell, supra, when Mr. Justice Black expressed the view of the majority that Congress was unauthorized by the Fourteenth Amendment's Equal Protection Clause to lower the voting age in state and local elections from 21 to 18. The Court held:

"No function is more essential to the separate and independent existence of the States and their governments than the power to determine within the limits of the Constitution the qualifications of their own voters for state, county, and municipal offices and the nature of their own machinery for filling local public offices. Pope v. Williams, 193 U.S. 621, 24 S.Ct. 573, 48 L.Ed. 817 (1904); * * * It is obvious that the whole Constitution reserves to the States the power to set voter qualifications in state and local elections, except to the limited extent that the people through constitutional

11. Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963); Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

amendments have specifically narrowed the powers of the States. * *

" * * * [I]t cannot be successfully argued that the Fourteenth Amendment was intended to strip the States of their power, carefully preserved in the original Constitution, to govern themselves. The Fourteenth Amendment was surely not intended to make every discrimination between groups of people a constitutional denial of equal protection." 400 U.S. 112, 125, 91 S.Ct. 260, 265, 27 L.Ed.2d 281–283.

Unlike residence, age and previous criminal record, registration has never been challenged as a legitimate requirement for voting.[12] Yet registration, with cutoff dates of varying lengths of time before elections, is required by practically every state in the Union. Congress itself has provided for registration, with a thirty-day cutoff period, as a requirement for voting for President and Vice President, 42 U.S.C. § 1973aa–1(d).

Our threshold inquiry is whether we should apply the traditional "rational relation" standard or the more stringent "compelling state interest" standard in passing upon the constitutionality of Mississippi's registration requirement. Choosing the correct standard will be determinative of the result in this case. Needless to say, the somewhat shifting emphasis by the Supreme Court in recent voting cases makes the task more difficult.

■■ By the rational relation or reasonableness test, a classification is valid under the Equal Protection Clause so long as the classification is rationally related to promoting a legitimate state interest, and is reasonable. "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it," and is invalid "only if the classification rests on grounds wholly irrelevant to the achieve-

ment of the State's objective." McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). Otherwise stated, the discrimination, to be a denial of equal protection, is one which "reflects no policy, but [is] simply arbitrary and capricious action." Reynolds v. Sims, supra, 377 U.S. at 557, 84 S.Ct. at 1379. A more exacting standard, however, is invoked where the state's classification impinges upon federally-secured constitutional rights. This doctrine, first developed in reviewing inherently "suspect" or invidious classifications such as those based on race (McLaughlin v. Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964)), lineage (Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944)), wealth (Harper v. Va. State Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966)), has been extended to interests identified as "fundamental" rights, as procreation (Skinner v. Okla. ex rel. Williamson, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942)), and interstate travel (Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969)). Under the compelling state interest standard the classification must be necessary to promote an articulated state interest, and the governmental interest thereby promoted must be one of an overriding nature.

■ Where the rational relation standard applies, there is a presumption of constitutionality and the burden is cast upon one who challenges the classification to demonstrate that the classification is irrelevant, arbitrary and serves no state policy. This presumption of constitutionality, however, is virtually reversed under the criteria of compelling state interest since it then becomes incumbent upon the state to show the classification assailed is essential to serve an overriding governmental interest.

The compelling state interest standard of equal protection review was first di-

12. An exceptional case, which is later referred to, is Beare v. Smith, 321 F.Supp. 1100 (S.D.Tex.1971), in which Texas' onerous annual registration statute passed in the wake of the state's poll tax demise, was held unconstitutional.

rectly applied to voter cases in Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), to strike down a New York statute which prohibited certain qualified voters— those without children in school or owning or leasing taxable real property— from voting in school district elections. Since various lower courts have interpreted *Kramer* and its progeny[13] as sounding the death knell to the rational relation test in all voting cases and mandating that a state justify its general voter qualifications in terms of compelling governmental interest,[14] the holding in *Kramer* must be critically examined. The majority opinion, which was authored by Chief Justice Warren,[15] reiterated (395 U.S. p. 625, 89 S.Ct. p. 1889) that "the States have the power to impose *reasonable* citizenship, age and residency requirements on the availability of the ballot", citing Carrington v. Rash and Pope v. Williams. The Court then carefully pointed out that the "sole issue in this case is whether the *additional* requirements of [the New York statute]— requirements which prohibit some district residents who are otherwise qualified by age and citizenship from partici-

pating in district meetings and school board elections—violate the Fourteenth Amendment's command that no State shall deny persons equal protection of the laws." (Original emphasis). It was in the context of a statute granting the right to vote to a portion of the qualified electorate and denying it to others that the Court was required to "determine whether the exclusions are necessary to promote a compelling state interest", citing Carrington v. Rash (p. 627, 89 S.Ct. p. 1890). *Kramer's* holding that New York had provided an unconstitutional classification thus reaffirmed the principle that "once the franchise is *granted to the electorate,* lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment", Harper v. Va. Board of Elections, supra, 383 U.S. at 665, 86 S.Ct. at 1081 (Our emphasis). *Kramer* does not, in our opinion, teach that a state's general voting qualifications are no longer to be tested by the rational relation standard but must be reviewed in terms of a compelling state interest.

Recent expressions from the Supreme Court clearly support the lucid analysis

---

13. Cipriano v. Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969); Evans v. Cornman, 398 U.S. 419, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1970); and Phoenix v. Kolodziejski, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970).

14. Nine three-judge district courts since 1970 have invalidated durational residency voting requirements ranging from three months to one year under the Equal Protection Clause by compelling state interest rule. These cases no longer regard as good law Pope v. Williams, supra, and Drueding v. Devlin, 380 U.S. 125, 85 S.Ct. 807, 13 L.Ed.2d 792 (1965), which held constitutional reasonable (one year) residential requirements for voting, on the basis of a forecast made by Mr. Justice Marshall in Hall v. Beals, 396 U.S. 45, 52, 90 S.Ct. 200, 24 L.Ed.2d 214, 220 (1969), and Footnote 21 in Shapiro v. Thompson, 394 U.S. at 638, 89 S.Ct. 1322, 22 L.Ed. 2d 600. The cases adopting this view, seven of which are presently on appeal to the Supreme Court, are:
Burg v. Canniffe, 315 F.Supp. 380 (D. Mass.1970);

Affeldt v. Whitcomb, 319 F.Supp. 69 (N.D.Ind.1970);
Lester v. Board of Elections for District of Columbia, 319 F.Supp. 505 (D.D.C.1970);
Bufford v. Holton, 319 F.Supp. 843 (E. D.Va.1970);
Hadnott v. Amos, 320 F.Supp. 107 (M.D. Ala.1970);
Kohn v. Davis, 320 F.Supp. 246 (D.Vt. 1970);
Keppel v. Donovan, 326 F.Supp. 15 (D. Minn.1970);
Ellington v. Blumstein, 400 U.S. 816, 91 S.Ct. 67, 27 L.Ed.2d 44 (M.D.Tenn. 1970);
Andrews v. Cody, 327 F.Supp. 793 (M. D.N.C.1971).
Still another case, Beare v. Smith, 321 F.Supp. 1100 (S.D.Texas 1971), invalidated a statutory requirement for annual registration with 8-month cutoff period by applying the more exacting standard.

15. The widely quoted definitions of the rational relation standard in *McGowan* and *Reynolds*, supra, were also authored by the same Chief Justice.

made by Circuit Judge Celebrezze in Howe v. Brown, 319 F.Supp. 862 (N.D. Ohio 1970),[16] as follows:

> "*Kramer* and its progeny stand for the following proposition: Persons who *qualify* under a state's valid election laws (by meeting its conditions of suffrage, i. e., age, residency, and citizenship requirements) have a *constitutional right* to vote in *all* state and local elections in which they have an interest. No state legislation or constitution may *impinge* upon this constitutional right to vote *once qualified* by 'selectively excluding' a class of otherwise qualified electors from voting in any election in which they have an interest, unless the 'compelling state interest' test is satisfied; that is, the classification of otherwise qualified voters excluded must be 'necessary' to promote a 'compelling state interest'.

> \* \* \* \* \* \*

> "Thus, in Kramer v. Union Free School District, *supra*, the classification had the effect of 'fencing out' otherwise qualified voters because of the way they might vote on financing of schools. In Carrington v. Rash \* \* \*, which we have not synthesized, the classification had the articulated state purpose of 'fencing out' otherwise qualified electors, who happened also to be military personnel, because of the way military personnel tend to vote. In Evans v. Cornman, *supra*, and Cipriano v. City of Houma, *supra*, the states 'fenced out' otherwise qualified voters for no legitimate reason whatever. And in City of Phoenix, Ariz. v. Kolodziejski, *supra*, the state 'fenced out' otherwise qualified voters who did not own real property who, therefore, might tend to vote in favor of general obligation bonds financed principally out of property taxes." (Original emphasis)

The *Howe* court upheld Ohio's one-year residency statute under the rational relation standard, saying:

> "Until the Supreme Court sees the need to apply the 'compelling state interest' test in all voting rights cases, or applies it across the board in equal protection cases, it is not within this Court's province to declare every inequality, every inconvenience, every burden a state places upon one class of citizens and not on another, and every distinction created by legislatures violative of the Equal Protection Clause. Quite the contrary; unless and until the Supreme Court teaches otherwise, this Court must uphold state classifications, which do not impinge upon constitutionally protected rights and are applied nondiscriminatorily, so long as the classification is rationally related to promoting a legitimate state interest."

*Howe's* rationale was, in our view, adopted by the Supreme Court in Gordon v. Lance, 403 U.S. 1, 91 S.Ct. 1889, 29 L.Ed.2d 273, a case decided June 7, 1971. There the Court sustained West Virginia's constitutional and statutory requirements that political subdivisions may not incur bonded indebtedness or increased tax rates beyond those established by the state's constitution without the approval of 60% of the voters in a referendum election. Reversing the West Virginia Supreme Court of Appeals, the Court held such provisions did not violate the Equal Protection Clause. Chief Justice Burger, speaking for six Justices, stated:

> "*Cipriano* was no more than a reassertion of the principle, consistently

16. Three district courts besides Howe v. Brown have upheld states' traditional residency requirements ranging from six months to one year under the rational relation standard. These cases are:
Cocanower v. Marston, 318 F.Supp. 402 (D.Ariz.1970, appeal filed 10–3–70, 400 U.S. 876, 91 S.Ct. 121, 27 L.Ed.2d 113;
Fitzpatrick v. Board of Election Comm., 39 L.W. 2356 (N.D.Ill.1970), appeal filed 2–12–71, 401 U.S. 905, 91 S.Ct. 882, 27 L.Ed.2d 803;
Piliavin Hoel, 320 F.Supp. 66 (W.D. Wisc.1970).

recognized, that an individual may not be denied access to the ballot because of some extraneous conditions, such as race, e. g., Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); wealth, e. g., Harper v. Virginia State Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); tax status, e. g., Kramer v. Union Free School Dist., 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); or military status, e. g., Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965).

"Unlike the restrictions in our previous cases, the West Virginia Constitution singles out no 'discrete and insular minority' for special treatment. The three-fifths requirement applies equally to all bond issues for any purpose, whether for schools, sewers, or highways.

\* \* \* \* \* \*

" \* \* \* [W]e can discern no independently identifiable group or category that favors bonded indebtedness over other forms of financing. Consequently no sector of the population may be said to be 'fenced out' from the franchise because of the way they will vote. Cf. Carrington v. Rash, supra, 380 U.S. at 94, 85 S.Ct. at 779, 13 L.Ed.2d 675."

Recognizing that the 60% requirement for approval had a reasonable relation to state interest, the wisdom of which was committed to the people of that state, the Court concluded that: "So long as such provisions do not discriminate against or authorize discrimination against any identifiable class they do not violate the Equal Protection Clause." Necessarily, the disposition of this case would have been different had the compelling interest test been applied.

We also think it quite pertinent that in Oregon v. Mitchell, supra, there was no attempt by any member of the Court to test the power of a state in fixing voting age qualifications by the compelling interest standard. As stated by Mr. Justice Stewart in his separate opinion, 400

U.S. at 294, 91 S.Ct. at 349, 27 L.Ed.2d at 379:

"Indeed, none of the opinions filed today suggest that the States have anything but a constitutionally unimpeachable interest in establishing some age qualification as such. Yet to test the power to establish an age qualification by the 'compelling interest' standard is really to deny a State any choice at all, because no State could demonstrate a 'compelling interest' in drawing the line with respect to age at one point rather than another. Obviously, the power to establish an age qualification must carry with it the power to choose 21 as a reasonable voting age, as the vast majority of the States have done."

The same considerations as to age would apply to disqualifying convicted felons from the franchise. It is highly doubtful that the state could show a compelling interest in separating certain crimes from others, or indeed using criminal conviction at all as a basis for withholding the franchise, despite the admitted fact that this is an area in which the state certainly has a legitimate interest. Davis v. Beason, 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637 (1890); Green v. Board of Elections of New York, 2 Cir., 380 F.2d 445 (1967); Waddy v. Davis, 445 F.2d 1, Fifth Circuit, June 28, 1971. Accord, Beachan v. Braterman, 300 F.Supp. 182 (S.D.Fla. 1969, 3-judge court), motion to affirm granted without opinion, 396 U.S. 12, 90 S.Ct. 153, 24 L.Ed.2d 11 (1969); Kronlund v. Honstein, 327 F.Supp. 71 (N.D. Ga.1971, 3-judge court).

Mississippi's requirement for registration, which applies generally to its entire electorate, is a prerequisite for voting in all elections for not only state, county, district, school, and municipal elective offices but also all bond elections and other matters required by state law to be submitted to popular vote. Manifestly, the requirement is neutral in principle, since it does not single out any "discrete and insular minority for

special treatment" or "discriminate against any identifiable class." Indeed, plaintiffs make no allegation that the deadline amounts to racial discrimination,[17] or that it fences out a group of persons from the franchise because of the way in which they might vote. A requirement for registration in state and local elections surely does not impinge upon any federally-protected right, as the right to travel interstate (Shapiro v. Thompson, supra), or freedom of political association (Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968)). Given these circumstances, we conclude that the registration provisions should be judged in accordance with the rational relation standard of Equal Protection review ordinarily applicable to general voting qualifications imposed by a state.

 There can be no doubt that Mississippi has a legitimate interest in ascertaining and identifying through the conventional method of registration, those persons who constitute its electorate, and that a public record of this sort is a necessary part of the machinery of elections, safeguarding against frauds. In fact, the state "has not only an interest in but also an obligation to provide orderly, honest elections." Johnson v. Hood, 430 F.2d 610, 612 (5 Cir. 1970). We do not understand that the plaintiffs challenge the state's legitimate interest toward achieving such objective through voter registration or the necessity for a cutoff date; rather, their claim is simply that a period of four months prior to the general election is excessively long, arbitrary and does not serve any reasonable purpose.

 Mississippi's registration statutes, previously noted, may be viewed as a valid procedural scheme designed to insure that all qualified citizens vote in the election precincts in which they reside. As conceded, the state has a legitimate interest in requiring some cutoff

date for the registration of its voters. Our only inquiry is whether a cutoff time of four months, when measured by the tasks to be performed by the election officials, is arbitrary and unreasonable. Our duty is not to judge the state's requirement in terms of whether it is wise or desirable, but whether "any state of facts reasonably may be conceived to justify it." That Mississippi's registration deadline may be the longest of any state in the Union, and twice as long as any other state, is neither controlling nor persuasive since the Constitution does not require uniformity among the states in the exercise of the state's power to set reasonable, general voter qualifications. Necessarily, a certain amount of time prior to the election is required for the discharge of important duties that are reposed in the election officials of each county. These duties, which in Mississippi are borne principally by election commissioners serving part-time, relate, in part, to maintaining up-to-date, accurate registration records and poll books; and they must be properly performed to avoid confusion and conduct orderly elections, prevent dual voting and assure the purity of the ballot. Also, these same officials not only conduct the general elections but carry out the state's important policy of securing the right to vote to all qualified persons, since they are authorized to hear appeals of registrants and other interested persons and determine voter qualifications. All such contests must be acted upon before the date of elections.

It is proper to note that every change in voter registration—whether an addition by new registration or a deletion by death or removal or other cause—necessitates changes in the poll books, and the invariable rush before the registration deadline adds to the burden of proper record keeping. While in some counties election officials, by employing extra help and working overtime, are able to prepare for an election within four to six

17. Since the passage on August 6, 1965, of the Voting Rights Act of 1965, Pub.L. 89–110, blacks have freely registered throughout the state and now compose 28% (307,350) of the currently registered voters (1,084,340).

weeks, this may not necessarily be true in all of the state's 82 counties. It is reasonable to conceive that varying conditions may prevail, and time-consuming problems may arise, necessitated by hearings of numerous appeals in contested registration cases. Balanced against these considerations, the simple act of timely registration, which is done only once except in case of unusual conditions (Footnote 9), does not impose a significant burden upon anyone.

Counsel for plaintiffs vigorously contend that since state law, § 3130, has only a 30-day registration deadline for voting in the August primaries which have historically had a far greater turnout of the state's voters and more candidates on the ballot than the general elections, the four-months registration deadline prior to the general election is constitutionally impermissible. Otherwise stated, the argument is that if only 30 days is allowed to prepare for the Democratic primary, the nominations in which are traditionally tantamount to election in Mississippi, the state can have no rational purpose for imposing a longer deadline for the general election. This argument is not without force at first blush, but fails after critical analysis. This court may not assume that Mississippi will continue to be dominated by a single political party, or that independent candidates will not play an important role in general elections. The utter fallacy of this contention is that it overlooks basic differences existing between the political party primary and the general election. Mississippi, long aware of the inherent distinctions between the two procedures, has specifically provided separate regulatory schemes to protect the different interests involved.[18]

The fundamental interest of the political party primary, in which the state has valid concern, is to nominate candidates for office who will advance the ideals and principles of the party, whereas the fundamental interest of general elections, in which the state has vital concern, is to assure that the elective officials are honestly chosen by the qualified voters participating in the electoral process.

Reviewing the state's statutes, we perceive that except for limited involvement by the registrar and election commissioners in preparing and revising primary election poll books, these public officials have no further duty in connection with the party primary. Rather, the state and county executive committees of the political party calling the primary are charged with the responsibility for conducting it, canvassing returns, and certifying the results. It is significant that persons offering to vote at a primary are subject to party loyalty restrictions, quite apart from the state's general voting requirements. And voters at a primary, despite the absence of their names on the primary election poll books, may have their ballots counted as determined by the party officials whose decision is final. Indeed, party officials are authorized to have new registration of the members of the party, if such would promote the welfare of the party, § 3108.5. Although the state has regulated certain aspects of the primary, it has nevertheless left to the party officials a substantial measure of freedom, including important prerogatives relating to who may or may not participate therein. Therefore, the analogy which plaintiffs would draw between the party primary and the general election is not well taken, for it ignores material differences addressed to the legislative judgment.

 We hold that the state may rationally adopt a different procedure for insuring the fairness and integrity of general elections without being limited to what it may or may not provide for the party primary that is only concerned with the nomination of candidates for office. There can be no doubt that the state is entitled to reasonable latitude in exer-

---

18. Separate Code chapters are provided for primary elections and for registration and general elections. §§ 3105–3196–18 regulate primary elections of a political party; §§ 3204–3316 govern registration and general elections.

cising its discretion to arrange its own election machinery, including conditions of voter registration. We are not required to make a legislative judgment as to whether Mississippi's registration deadline should be for a shorter time or to specify what the deadline should be; our task is completed when we are able to conclude, as we do, that four months is not unreasonable and discriminatory, and does not deny equal protection of law. In rejecting plaintiffs' equal protection claims, we are content to rely upon Mr. Justice Frankfurter's concurring opinion in McGowan v. Maryland, supra, 366 U.S. at 524, 81 S.Ct. at 1188:

> "Neither the Due Process nor the Equal Protection Clause demands logical tidiness. * * * No finicky or exact conformity to abstract correlation is required of legislation. The Constitution is satisfied if a legislature responds to the practical living facts with which it deals. Through what precise points in a field of many competing pressures a legislature might most suitably have drawn its lines is not a question for judicial re-examination. It is enough to satisfy the Constitution that in drawing them the principle of reason has not been disregarded."

Lastly, we consider plaintiffs' contention that Mississippi's registration deadline abridged the right of 18 to 20 year olds to vote in violation of the Twenty-sixth Amendment in that no more than two days were allowed for such persons to register in time to vote in the 1971 elections. This condition arose only because the Twenty-sixth Amendment was ratified on June 30, 1971. It is interesting to note that this Amendment which was not submitted by Congress until March 23, 1971, allowed seven years for its ratification by three-fourths of the states, and yet requisite approval was obtained in scarcely more than three months following its submission. The speed with which the Amendment was ratified is altogether without precedent in modern American history.

As we view the situation, it was a fortuitous circumstance produced by events of history that gave two days for young voters to register in Mississippi. If the Amendment had not been adopted until one month later, or July 30, the state's registration deadline would have already passed; had the ratification of the Amendment been deferred for five months, or until November 30, the young voters in Mississippi would have been altogether excluded from the state's 1971 general elections.

As a matter of fact, the state was not indifferent to the newly enfranchised young persons, since it was disclosed at our hearing that all 18 to 20 year-olds who had registered since January 1, 1971, for federal elections were considered registered for state primary and general elections without necessity of reregistration. In this manner, and also by new registrations within the two-day period, 70,300 young voters became qualified to participate in the state's 1971 electoral process. The position of the state Attorney General was that, regardless of common desire, the state was powerless to extend the registration deadline imposed by § 251 of its Constitution and Code § 3235 for any group or class of registrants. That conclusion is, without question, legally correct, since the state does not allow exceptions of any nature to be made to its registration requirement. The Twenty-sixth Amendment is not offended when failure to timely register, and not age, is the basis of voter ineligibility. Measured by the Equal Protection Clause, registration requirements, which are constitutional as they apply to the state's general electorate, do not become invalid because of a mere fortuity which may affect persons differently. Moreover, the peculiar condition produced by the joint operation of the Twenty-sixth Amendment and Mississippi's registration requirement has no significance beyond the 1971 elections and will not recur in the future. Under the facts presented, we hold that the plaintiffs have failed to raise a claim of federal constitu-

tional dimensions and neither the Twenty-sixth Amendment nor the Fourteenth Amendment has been abridged.

For the reasons stated, we hold that plaintiffs are not entitled to any relief prayed for and their complaint should be dismissed with prejudice. Let an order be entered accordingly.