Hardy WILLIAMS et al., Plaintiffs,

v.

Maurice OSSER et al., Defendants.

Civ. A. No. 71–979.

United States District Court,
E. D. Pennsylvania.

May 10, 1971.

Harry Wolov, Deputy City Sol., Philadelphia, Pa., for defendants.

Before ROSENN, Circuit Judge, and WOOD and LUONGO, District Judges.

## SUR MOTION FOR PRELIMINARY INJUNCTION

LUONGO, District Judge.

Plaintiffs (some of whom seek nomination of the Democratic Party for various municipal offices in Philadelphia, others are electors of the City of Philadelphia) seek to enjoin defendants, the Philadelphia City Commissioners for Voter Registration and Elections (Commissioners), from enforcing certain provisions of "The First Class City Permanent Registration Act," 25 P.S. § 623–1 et seq. (Permanent Registration Act) on the ground that those provisions of the Permanent Registration Act are unconstitutional on their face, or as applied. At plaintiffs' request a three-judge court was convened pursuant to the pro-

visions of 28 U.S.C. § 2281. A hearing was held on May 6, 1971, on certain of the issues raised by plaintiffs' motion for a preliminary injunction.

## I. THREE–JUDGE COURT

Initially it must be determined whether this matter is properly one for a three-judge court. Under § 2281 a three-judge court is required and authorized only where an injunction is sought on the grounds of unconstitutionality against enforcement or execution by state officers of a state statute of statewide application. 28 U.S.C. § 2281.[1]

Attacked here as unconstitutional on its face are those portions of the Permanent Registration Act which (a) provide for notice to persons who have failed to vote at any general or primary election for two consecutive years that their registration will be cancelled unless written request for reinstatement is made (25 P.S. § 623–40)[2] and (b) establish a 50-day cut off for registration prior to general and primary elections (25 P.S. § 623–17).[3]

■ ■ The Permanent Registration Act is applicable to all cities in Pennsylvania with a population large enough to qualify as first-class cities. Consequent-

1. "§ 2281. *Injunction against enforcement of State statute; three-judge court required*

"An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this Title."

2. § 623–40. *Cancellation of registration upon failure to vote within certain periods; request for reinstatement; correction of errors of the commission in cancellation of registration*

"Within three months after the first day of January of each year, the commission shall cause all of the district registers to be examined, and in the case of each registered elector who is not recorded as having voted at any election or primary during the two calendar years immediately preceding, the commission shall send to such elector by mail, at his address appearing upon his registration affidavit, a notice, setting forth that the records of the commission indicate that he has not voted during the two immediately preceding calendar years, and that his registration will be cancelled at the expiration of ten days from the date of mailing such notice unless he shall, within that period, file with the commission, either personally or by mail, a written request for reinstatement of

his registration, signed by him, setting forth his place of residence. A list of the persons to whom such notices shall have been mailed shall be sent promptly to the city chairman of the political party of which the electors were registered as members. At the expiration of the time specified in the notice, the commission shall cause the registration of such elector to be cancelled unless he has filed with the commission a signed request for reinstatement of his registration as above provided. The cancellation of the registration of any such elector for failure to vote during the two immediately preceding calendar years shall not affect the right of any such elector to subsequently register by personal application in the manner provided by this act.

"Whenever the registration of an elector has been cancelled through error, such elector may petition the commission for the reinstatement of his registration not later than the tenth day preceding any primary or election, and after a hearing on said application, if error on the part of the commission is proved, the commission shall reinstate the registration of such elector."

3. 25 P.S. § 623–17 provides, in pertinent part:

"The commission * * * shall * * * except * * * the day of each election and each primary, the fifty days next preceding each general, municipal and primary election, * * * and the thirty days next following each election and the five days following each primary, receive personal applications from persons who claim that they are entitled to be registered as electors of the city * * *."

ly the statute is one of statewide application notwithstanding that Philadelphia is the only city which currently fits that classification. Moreover, although the Commissioners are local officers, since the upcoming election includes statewide (seats on the Supreme Court of Pennsylvania) as well as local, offices, the defendants are performing state functions in determining the eligibility of persons to vote in a state election. See Kauffman v. Osser, 321 F.Supp. 327 (E.D.Pa.1971); Gilhool v. Chairman and Commissioners, Philadelphia County Board of Elections et al., 306 F.Supp. 1202 (E.D.Pa.1969), aff'd, 397 U.S. 147, 90 S.Ct. 996, 25 L.Ed.2d 182 (1970). See generally Moody v. Flowers, 387 U.S. 97, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1967).

At least with respect to the "two-year non-vote purge" (§ 623–40) and the 50-day registration cut off (§ 623–17), this action clearly seeks injunctive relief against state officers to restrain the enforcement and execution of a statute of statewide applicability on the grounds of unconstitutionality, and the matter is therefore properly one for a three-judge court.

Plaintiffs have also attacked as unconstitutional certain other provisions of the Permanent Registration Act as applied by the defendants, charging that the practices and methods utilized by the defendants in carrying out other statutory means for removing persons from the registration rolls, i. e., inspectors canvass (§ 623–33), mail canvass (§ 623–32), strike-off petitions (§ 623–35), and official reports (§ 623–31), have violated their constitutional rights. Complaints such as these can properly be heard by a single judge although a three-judge court, properly convened, may entertain such claims as ancillary to the three-judge issues. See Swift & Co. v. Wickham, 230 F.Supp. 398 (S.D.N.Y.

1964), appeal dismissed, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965). Public Service Comm'n of Missouri v. Brashear Freight Lines, Inc., 312 U.S. 621, 61 S.Ct. 784, 85 L.Ed. 1083 (1941). This three-judge court, in the exercise of its discretion, determined not to consider those matters which could properly be determined by a single judge court, and so informed counsel at the outset of the hearing. The May 6 hearing was restricted, therefore, to issues raised by the "two-year non-vote purge" and the 50-day registration cut off provisions. Counsel for plaintiffs, recognizing that the date of the hearing (May 6) was too close to primary election day (May 18) to allow meaningful preliminary injunctive relief with respect to the 50-day registration cut off, advised the court that they would present no evidence on that phase of their complaint at the hearing on the motion for preliminary injunction, but they expressly reserved that question for final hearing. The hearing on the motion for preliminary injunction was, therefore, confined to the "two-year non-vote purge."

## II. PRELIMINARY INJUNCTIVE RELIEF

Under the Permanent Registration Act a person who registers[4] to vote is permanently enrolled so long as he does not change his place of residence and so long as he does not fail to vote for a period of two consecutive years. 25 P.S. §§ 623–20, 623–40. In the case of a person who fails to vote for two consecutive years, § 623–40 provides that the Commissioners must send a notice by mail to the voter's listed address, informing him that his registration will be cancelled unless he files with the Registration Commission a written request for reinstatement within 10 days. If written request is not made within that

---

4. A person is eligible to vote in state elections if he is a citizen of the United States over 21 years old, has resided in the state for one year, and in the election district for 60 days, and has not been convicted of election fraud within the past four years. Pa.Const., Art. 8, § 1; 25 P.S. § 623–19(a) and 25 P.S. §§ 2811 through 14.

time, the Act requires that a second notice be sent to the voter informing him that his registration has been cancelled.

Plaintiffs contend that § 623–40 violates their Fourteenth Amendment due process rights in that it places upon the right to vote a restriction which is not justified by any compelling state interest. They contend further that the section violates the equal protection clause of the Fourteenth Amendment by singling out for separate treatment those who do not vote for regularly and such separate treatment unfairly discriminates against Negroes because the deterrent effect of the restriction on voting falls more heavily on them than on other segments of the population.

Defendants assert that the two-year non-vote purge provision serves a legitimate and compelling state interest in that it protects the electoral process against election fraud by providing a safeguard against "phantom" voters. The substance of defendants' position seems to be that a person who has not voted for two years and who fails to respond to the notices to apply for reinstatement is either no longer a resident or no longer desires to remain on the voting rolls.

In January 1971, pursuant to the provisions of § 623–40, the Commissioners mailed first notices to 92,000 registered voters who had failed to vote for two consecutive years. Approximately 11,-000 persons responded within the prescribed time and were reinstated. Thereafter, notices of cancellation (second notices) were mailed to the 81,000 persons who had failed to respond to the first notice. As required by § 623–40, the Commissioners furnished to representatives of the political parties a list of all persons to whom cancellation notices had been sent. Each of the parties has procedures for verifying the accuracy of the purge list and for seeking reinstatement of those voters who want to remain on the rolls. Some 2,000 of those to whom cancellation notices were mailed requested, and were granted, reinstatement. The remaining 79,000 who had not, as of the date of hearing, responded to either of the notices have been removed from the voting rolls and are presently ineligible to vote in the primary election scheduled for May 18. It has been and is the practice of the Commissioners, however, to grant requests for reinstatement up to election day for any person removed for non-voting provided he still meets the residency requirements and submits some writing bearing his signature. In addition, there is provision for reinstatement of a voter on election day at his polling place.[5]

In their motion for preliminary injunction plaintiffs seek blanket reinstatement of all the remaining 79,000 voters removed by the two-year non-vote purge procedure, and they ask that we require defendants to mail to each of the 79,000 a card advising him that he is eligible to vote.

One of the difficulties with plaintiffs' position is that they have presented no evidence from which the Court is able to make even a rough approximation as to the percentage of the 79,000 persons so stricken who may be otherwise (apart from the contested removal procedure) eligible to vote. One witness, Mrs. Wylie, a former committeewoman, testified that she was personally aware of instances where persons had been removed for non-voting but still resided at the same address as the one from which they were registered to vote, or at another address within the same voting division. Mrs. Wylie testified that some of those persons were illiterate, or virtually so, and did not understand what the notices meant. In their memorandum of law in

---

5. The procedure for reinstatement at the polling place is somewhat more complicated. The voter must sign an affidavit, which is then sent by messenger to the Registration Commission's offices where the signature is checked. If the signature checks out, a staff member informs the election officials at the polling place, returns the voter's affidavit to the polling place, and the voter is then permitted to vote.

support of the motion for preliminary injunction, counsel for plaintiffs have suggested that the number "improperly" stricken "may well number over 10,000 and close to 50,000" (p. 3 Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction), but the figures represent pure speculation since nothing in the evidence suggests any such conclusion. While it appears fairly certain that some of the persons stricken for non-voting still meet the citizenship, age and residency requirements, we cannot hazard a guess whether the number is substantial.

Plaintiffs also contend that there is no reasonable relationship between non-voting and eligibility to vote; that other procedures authorized by statute (e. g., inspectors canvass, mail canvass, public records relating to death, reports of discontinuance of service by utility companies, reports from real estate agents, landlords and moving companies that persons had moved) make unnecessary the use of non-voting as a basis for removal; and that removal from the voting rolls for non-voting is an overly broad device to prevent vote fraud and is unduly restrictive of the right to vote.

It appears from the evidence presented at the hearing that the non-vote purge is an important and effective tool for keeping the voting lists current. Many of the devices authorized by statute (e. g., reports from utility companies, real estate agents and landlords) are so unreliable that they have been virtually abandoned by defendants as a means for ascertaining if voters have changed their residences. The other procedures (inspectors canvass, mail canvass, etc.), while effective, cannot be relied on for a thorough job of weeding out ineligibles.

The evidence discloses that Pennsylvania adopted permanent registration in 1937 by legislation which contained a four-year non-vote purge provision. In the early 1940's a citizens' committee (Committee of Seventy) instituted litigation aimed at eliminating widespread vote frauds caused by the presence on the voting rolls of large numbers of phantom voters. This litigation led to adoption in 1945 of the legislation presently under attack, which reduced the non-vote purge period to two years. Plaintiffs did produce testimony of Dr. Stanley Kelley, Jr., Professor of Political Science at Princeton University that, from a study of 104 cities of over 100,000 population, he found there was no necessary relationship between non-voting and being otherwise eligible to vote, but at this stage of the proceedings we cannot say that plaintiffs have established that there is no reasonable relationship between non-voting *and vote frauds*, which is a matter of legitimate concern to defendants and to the general electorate.

Plaintiffs complain that the two-year non-vote purge has an especially heavy impact on municipal elections. They point to the fact that in the municipal election years 1967 and 1971 the number of two-year non-vote notices was significantly higher than in the intervening years. The figures for the years 1967–1971, stated in round numbers, are:

|  | 1967 | 1968 | 1969 | 1970 | 1971 |
|---|---|---|---|---|---|
| First notices | 94,000 | 35,000 | 31,000 | 33,000 | 92,000 |
| Second notices | 80,000 | 31,000 | 29,000 | 31,000 | 81,000 |

The large numbers of strike-offs in the municipal election years is attributable to the fact that municipal elections are held in the third year following presidential elections, and presidential elections traditionally attract the heaviest voting interest and participation. While it may be argued that even persons who desire to vote only in presidential elections should remain eligible to vote without re-registering, we fail to see how the removal of persons whose only interest apparently is to vote in presidential elections prejudices these plaintiffs at this municipal primary election. Further, there is nothing in this record, as yet, to establish whether substantial numbers of the people who voted at the last presiden-

tial election, and have not voted since, still maintain residence in the City.

Plaintiffs charge also that the two-year non-vote purge provision is a denial of equal protection in that § 623-40 has a greater deterrent effect on the voting rights on Negroes than on other segments of the voting population. The statute on its face certainly makes no distinction of any kind and, indeed, the evidence as to how the statute is administered indicates that it is applied uniformly. For example, of the 81,000 second notices sent out so far this year (the second notices are the only ones for which such a breakdown is presently available), 51,000 were sent to white voters and 30,500 were sent to non-white voters. This roughly approximates the population ratio of the two groups within the City. We find nothing in the statute which sanctions, encourages or permits discrimination against any segment of the voting population, and we find nothing discriminatory in the way the statute has been administered.

A preliminary injunction is an extraordinary and far-reaching remedy, and should be used only in clear cases, reasonably free from doubt and only when necessary to prevent great and irreparable injury and to preserve the status quo pendente lite. Dorfmann v. Boozer, 134 U.S.App.D.C. 272, 414 F.2d 1168 (1969); Dymo Industries, Inc. v. Tapeprinter, Inc., 326 F.2d 141 (9 Cir. 1964); Wyrough & Loser, Inc. v. Pelmor Laboratories, Inc., 376 F.2d 543 (3 Cir. 1967). Before issuing an injunction the Court must balance the damage to the parties from the granting or withholding of the injunctive relief [Dorfmann v. Boozer, supra], as well as the interest of the public and the likelihood that plaintiffs will ultimately prevail on the merits. Nelson v. Miller, 373 F.2d 474 (3 Cir.), cert. denied, 387 U.S. 924, 87 S.Ct. 2042, 18 L. Ed.2d 980 (1967); Coffee Dan's, Inc. v. Coffee Don's Charcoal Broiler, 305 F. Supp. 1210 (N.D.Cal.1969).

■ A balancing of the interests of plaintiffs and defendants leads us to conclude that preliminary injunctive relief should be denied.

Plaintiffs' interest lies in seeing to it that every person who was registered to vote at the beginning of this year and who meets citizenship, age and residency requirements will be permitted to vote on primary election day if he desires to do so. Defendants' interest is in maintaining the purity of the voting lists, minimizing the potential for vote frauds, and avoiding disruption of the election process.

We believe that plaintiffs' interest can be served without issuance of a preliminary injunction, while defendants' interest cannot be served if the requested preliminary injunction should issue. In other words, plaintiffs will not suffer irreparable harm if the injunction does not issue, but defendants will be unduly burdened and may be severely injured by the issuance of an injunction. See Garza v. Smith, 320 F.Supp. 131 (W.D.Texas 1970).

Our reasons are these:

First, we regard (at least for the purpose of this motion for preliminary injunction) the procedures prescribed by the Act, i. e., first notice, second notice, furnishing lists of removed voters to the political parties, as reasonable measures for insuring reinstatement of all those registered voters who *desire* to be retained on the voting rolls. Next, we are persuaded by defendants' practice of granting requests for reinstatement up to election day, and by the procedure that is available for obtaining the right to vote at the polling place on election day, that any person who was registered to vote at the beginning of this year and who desires to vote at the primary election on May 18, will be able to do so. Under such circumstances we are unable to find irreparable harm to plaintiffs if a preliminary injunction does not issue.

On the other hand, if we were to grant the preliminary relief requested by plaintiffs (ordering reinstatement of 79,000 names and the mailing of cards to each of them advising that they are eligible to vote upon presentation of the card at the polling place) we would be imposing a tremendous burden on defendants on the eve of election, and we would be creating a substantial and unreasonably high risk of vote fraud. The administrative and ministerial burden upon the defendants and upon local election boards by the last minute inclusion of 79,000 unchecked names of voters is immediately apparent. The effect could well be to seriously impair or even disrupt the entire election process.

Part of the result here is unquestionably due to timing, and in this regard plaintiffs themselves are at least partly to blame. The statute under attack has been on the books since 1945 and has apparently been administered in the same fashion during all that time. First notices on the two-year non-vote purge in 1971 were sent out in January, yet plaintiffs did not start this suit until April 28, some three weeks before the primary election. While we do not rest our decision in any degree on any theory of laches, we nevertheless cannot overlook the time element as it bears upon the magnitude of the burden which would be placed ·upon defendants and upon the election process if we were, at this late date, to grant the relief requested.

In our view, the harm to defendants and to the general electorate by granting the relief requested would far outweigh the alleged benefit which plaintiffs would derive from it. Accordingly, the motion for preliminary injunction to restore to the list of voters all those whose names have been stricken pursuant to § 623–40 will be denied.

The foregoing shall constitute the Court's findings of fact and conclusions of law to the extent that they are required by Rule 52(a), Federal Rules of Civil Procedure.