**Hardy WILLIAMS et al., Plaintiffs,**

**v.**

**Maurice OSSER et al., Defendants.**

**Civ. A. No. 71–979.**

United States District Court,
E. D. Pennsylvania.

Oct. 19, 1972.

Dissenting Opinion Oct. 20, 1972.

Robert J. Sugarman, Philadelphia, Pa., for plaintiffs.

Harry Wolov, Asst. City Sol., Philadelphia, Pa., for defendants.

Before MAX ROSENN, Circuit Judge, and LUONGO and GORBEY, District Judges.

## OPINION

MAX ROSENN, Circuit Judge.

Plaintiffs have instituted a civil rights class action challenging certain statutes and administrative practices relating to voting. Jurisdiction for this three-judge court is asserted under 28 U.S.C. §§ 1343(3) and (4), and 42 U.S.C. § 1971(d).

Under attack before us on final hearing on the merits is the constitutionality of a section of Pennsylvania's "First Class City Permanent Registration Act," 25 P.S. § 623–1 et seq., which provides for removal from the voter registration lists of persons who have not voted at any election or primary during the two immediately preceding calendar years and who, after notice, have failed to request reinstatement of registration, 25 P.S. § 623–40 [1] (referred to hereinafter

[1]. The pertinent provisions of this section are:

Within three months after the first day of January of each year, the commission shall cause all of the district registers to be examined, and in the case of each registered elector who is not recorded as having voted at any election or primary during the two calendar years immediately preceding, the com-

as the two-year purge). A request for preliminary injunction against the operation of that section was earlier denied by this court in an opinion by Judge Luongo.[2] Williams v. Osser, 326 F. Supp. 1139 (E.D. Pa. 1971).

Plaintiffs' complaint is that the two-year purge statute places an unconstitutional burden upon the fundamental right to vote. They contend that the section violates the equal protection clause by singling out for separate treatment those who have not voted for two consecutive calendar years.[3]

Named plaintiffs are five candidates who ran in the May 18, 1971, Philadelphia Democratic primary, the Black Political Forum, and four other residents of Philadelphia. One of the plaintiffs was stricken from the registration list by the two-year purge. Each plaintiff sues on his own behalf and on behalf of others similarly situated. Defendants are the three Philadelphia city commissioners and the deputy commissioner in charge of registration.

At the hearing on plaintiffs' motion for preliminary injunction, we found the following facts:

In January 1971, pursuant to the provisions of § 623–40, the Commissioners mailed first notices to 92,000 registered voters who have failed to vote for two consecutive years. Approximately 11,000 persons responded within the prescribed time and were reinstated. Thereafter, notices of cancellation (second notices) were mailed to the 81,000 persons who had failed to respond to the first notice. As required by § 623–40, the Commissioners furnished to representatives of the political parties a list of all persons to whom cancellation notices had been sent. Each of the parties has procedures for verifying the accuracy of the purge list and for seeking reinstatement of those voters who want to remain on the rolls. Some 2,000 of those to whom cancellation notices were mailed requested, and were granted, reinstatement.

Williams v. Osser, 326 F.Supp. at 1142.

mission shall send to such elector by mail, at his address appearing upon his registration affidavit, a notice, setting forth that the records of the commission indicate that he has not voted during the two immediately preceding calendar years, and that his registration will be cancelled at the expiration of ten days from the date of mailing such notice unless he shall, within that period, file with the commission, either personally or by mail, a written request for reinstatement of his registration, signed by him, setting forth his place of residence. A list of the persons to whom such notices shall have been mailed shall be sent promptly to the city chairman of the political party of which the electors were registered as members. At the expiration of the time specified in the notice, the commission shall cause the registration of such elector to be cancelled unless he has filed with the commission a signed request for reinstatement of his registration as above provided. The cancellation of the registration of any such elector for failure to vote during the two immediately preceding calendar years shall not affect the right of any

such elector to subsequently register by personal application in the manner provided by this act.

Although 25 P.S. § 623–40 applies only to first class cities, similar two-year purges are provided for second, second A, and third class cities, boroughs, towns and townships by 25 P.S. § 951–38.

2. Also originally presented as a three-judge court issue was an attack on the validity of the 50-day registration cut-off provision. 25 P.S. § 623–17. That attack was not pressed on this final hearing because the Federal Voting Rights Act of 1970, 42 U.S.C. § 1973aa–1 et seq., requiring registration up to 30 days before election day is concededly applicable in this presidential election year, and because Pennsylvania legislation changing the cut-off time in state elections has been enacted. Pub.L.No.183, § 1(a) (July 12, 1972).

3. Plaintiffs also originally contended that the statute discriminated against Negroes, but at preliminary hearing we found insufficient evidence to support this charge, and no additional evidence has been presented.

At final hearing, plaintiffs introduced a survey of the persons stricken [4] under the two-year purge in Philadelphia. By a method stipulated to be statistically valid, a random sample consisting of 491 persons stricken was obtained. It was ascertained that 287 (58.5%) had not moved from their registered residence, 179 (36.5%) had moved, and 16 (3.3%) had died. No contact was made or information obtained concerning 9 (1.7%). Of the 287 persons who had not moved, 98 (34.1%) had either re-registered or been reinstated to the voter registration list by other procedures. There remained, then, 189 (38.5%) of the sample who had been removed from the voting rolls for failure to vote or to signify their desire to be reinstated, although they qualified in all other respects (age, residency, and citizenship) with the voting eligibility requirements.

A projection of the information obtained from the sample indicates that 31,706 bona fide residents of requisite age and citizenship have been stricken from the voter registration lists solely because of failure to vote in elections or primaries during the preceding two calendar years and failure, after notice, to signify their desire to be reinstated.

From the survey, plaintiffs ascertained that 195 voters had either moved or died. Information as to the ineligibility of 51 of those voters had been obtained by the Registration Commission by means other than the two-year purge, such as inspector canvases, death notices, committeeman investigations, and re-registrations at new addresses. Therefore, the two-year purge identified 144 persons (29.4%) who had moved, died, or were otherwise not eligible to vote, and who would not have been identified by other means. Projection from the sample, therefore, indicates that through the two-year purge the Commission identified 24,211 such persons.

Plaintiffs also presented testimony of James A. Green, State Commissioner of Elections, who expressed the opinion, based on his experience, that the two-year purge is an unnecessary burden on the right to vote, and that a longer non-voting period before purging would be a more effective means of preventing voter fraud. Professor Stanley Kelley expressed the opinion, on the basis of a study made by him of voting and registration practices in 104 American cities, including Philadelphia, that any registration requirement deters voting. The two-year purge, in his opinion, was a significant deterrent "as compared to the less restrictive requirements."

The defense offered the testimony of Jack Welsh, Voting Registration Supervisor for 20 of his 32 years of employment with the Philadelphia Registration Commission, that the two-year purge was "very necessary" to keep the voting rolls pure and free of "phantom voters" and to minimize voter fraud. He said that Philadelphia had gone through a period of vote fraud, but because of the "two-year non-vote purge plus all the other means of strike-off, our rolls are clean."

The procedures by which the statute is implemented were explained by defendants. All registered voters who have not voted in two years are sent a notice that their registration will be cancelled unless they request reinstatement in writing within ten days.[5] No sooner than ten days after the notice date, registration affidavits are removed from the voting books and second no-

---

4. The final count showed that 82,352, not 79,000, were actually stricken from the list of eligible voters.

5. The first notice reads:
   Our records show that you are registered under The Permanent Registration Act, at the address shown on the reverse of this card, but have failed to vote at any Election or Primary within the last two years.
   You are hereby notified that your registration will be cancelled pursuant to law, unless you file with the Commission, within 10 days from this date, a written request for reinstatement, signed by yourself, setting forth your place of residence.

tices sent.[6] When the affidavits are removed, they are placed in a special file, so that the voter can be restored, if he requests, at any time up to election day. Edward G. Mekel, Deputy Commissioner in charge of the registration division, said that voters are restored upon returning the notice with their signatures affixed, or even upon telephone request.

The plaintiffs contend that the two-year purge is a significant deterrent to voting and, therefore, unconstitutional unless justified by a compelling state interest. They argue that there is no compelling state interest because there are other less burdensome techniques available to accomplish the purposes of the non-voting purge.

The defendants answer that the two-year purge serves a legitimate state interest because it protects the electoral process against election fraud by providing a safeguard against "phantom" voters. They argue that the burden upon the non-voter who wishes to remain upon the registration rolls is minimal.

The threshold question is what standard to apply in determining the constitutionality of this statutory requirement.

■■ In deciding whether state action classifies unconstitutionally, the Supreme Court has articulated two essentially distinct tests. The traditional test requires that the statute be upheld if any "reasonable basis" exists for the classification and the basis is reasonably and rationally related to the achievement of a legitimate state interest. On the other hand, if the classification affects a "fundamental" right or effectuates a "suspect" grouping, it will be "carefully and meticulously scrutinized" by the Court in search for a compelling state interest.[7] Because of the overriding importance of voting rights, the Supreme Court has stated that "classifications which might invade or restrain them must be closely scrutinized and carefully confined." Harper v. Virginia State Board of Elections, 383 U.S. 663, 670, 86 S.Ct. 1079, 1083, 16 L.Ed.2d 169 (1966). In Bullock v. Carter, 405 U.S. 134, 143, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1972), however, Chief Justice Burger was careful to point out that: "Of course, not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review."

■ We do not believe that the two-year purge provision should be subjected to the more stringent review standard. In McDonald v. Board of Election, 394 U.S. 802, 807, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969), the Supreme Court did not apply that standard of review in a case involving the supply of absentee ballots to prisoners awaiting trial. In so doing, it announced two guidelines for determining whether the more stringent test was applicable. First, it said the test was not applicable because discrimination on the basis of race or wealth was not involved in the classification system. Here, it was originally alleged, that there was racial discrimination because of the two-year purge, but no such discrimination was ever proven. Second, the Court said in McDonald that the more stringent review standard was not to be applied since it found nothing in the record to indicate that the appellants were absolutely barred from voting. See Goosby v. Osser, 452 F.2d 39 (3d Cir. 1971). A voter may not under the two-year purge provision be stricken from the registration rolls until ten days after the Registration Commission has mailed to him at his registration address a written no-

---

6. The second notice reads:
    This is to notify you that you are required to satisfy the Commission of your continued residence at the address below within ten days from date hereof or your voter registration will be cancelled. If you are in the actual military service of the United States Government, please notify the Commission immediately.

7. *See* Comment, The Constitutionality of Qualifying Fees for Political Candidates, 120 U.Pa.L.Rev. 109, 114 (1971) (and cases cited therein).

tice of his failure to vote and that his registration will be cancelled unless he requests reinstatement. The Philadelphia Registration Commission, although not required by the statute, also sends him a second notice. If he requests reinstatement, his registration will not be cancelled. In addition, he can avoid the purge provision of the statute merely by voting. This burden should not trigger the strict scrutiny test.

In reaching this conclusion, we are not unmindful of the cases that have required a stringent standard of review in passing on the constitutionality of restrictions on the right to vote. We think that these cases are distinguishable because either the classifications involved were suspect, or a substantial burden fell on a distinct political group, or the impact on the exercise of the franchise actually precluded voting.

In Harper v. Virginia State Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), the Supreme Court, applying the strict scrutiny equal protection test, declared unconstitutional Virginia's annual $1.50 poll tax. It applied that test, however, because the tax resulted in a classification based on wealth and "[l]ines drawn on the basis of wealth or property, like those of race . . ., are traditionally disfavored." *Id.* at 668, 86 S.Ct. at 1082. It should also be noted that *Harper* was decided in the context of turmoil over racial discrimination and many Southern states' use of numerous barriers to prevent complete and effective enfranchisement of black citizens. *Cf.* South Carolina v. Katzenbach, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966).

In Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972), the Court applied the strict scrutiny standard in finding unconstitutional the Texas candidate qualifying fee scheme, again relying on the existence of a wealth classification. *See id.* at 144, 92 S.Ct. 849, 856. *Bullock* was also premised on the existence of an appreciable impact on the exercise of the franchise since voters were "substantially limited in their choice of candidates." This limitation, the Court reasoned, "would fall more heavily on the less affluent segment of the community, whose favorites may be unable to pay the large costs required . . . ." *Id.* at 144, 92 S.Ct. at 856.

Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), also involved a suspect classification, persons who had recently exercised their constitutional right to travel interstate. Moreover, the burden on the right to vote was a complete denial; the franchise could not be gained by any action on the part of the voter.

Williams v. Rhodes, 393 U.S. 23, 89 S. Ct. 5, 21 L.Ed.2d 24 (1968), involved, as did *Bullock*, the effective disenfranchisement of a distinct and identifiable political group. Also imposed was a burden on the right of individuals to associate for the advancement of political beliefs.

Kramer v. Union Free School District No. 15, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), and its progeny, Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969), and City of Phoenix v. Kolodziejski, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970), involved both the complete disenfranchisement of distinct community segments and wealth classifications.

Reynolds v. Sims, 377 U.S. 533, 84 S. Ct. 1362, 12 L.Ed.2d 506 (1964), concerned the diluted effect of the votes actually cast by some voters. Because of malapportionment, a voter could do nothing to make his vote weigh as heavily as that of voters in less populous districts.

In the instant case, no suspect classification is created, no political group is disenfranchised, and no voter is absolutely barred from casting an effective vote.

Although we express no opinion as to the correctness of the result in Beare v. Smith, 321 F.Supp. 1100 (S.D. Tex. 1971), which declared unconstitutional

the Texas annual registration requirement, we note that case also differs from the case *sub judice*. First, Texas required all voters to re-register each year, a burden greater than that imposed by the Pennsylvania purge provisions.[8] Second, the challenged statute included a requirement that the registration books be closed on January 30th of each year. Third, the court found the system disqualified more than a million persons who would otherwise be permitted to vote. *Id.* at 1108. None of these factors is present in this case.

Michigan State UAW Community Action Program Council v. Austin, 387 Mich. 506, 198 N.W.2d 385 (1972), based on the state constitution, struck down Michigan's two-year purge statute. To the extent that the analysis is inconsistent with this decision, we decline to follow it.

Although we have decided that the less stringent standard is applicable in this case, the Constitution still requires this court to balance the interests served by the statutory section against the burden on the individual. Some cases have indicated that a statute reviewed under the less stringent standard is to be sustained if the court can find any conceivable legitimate basis to justify it. *See, e.g.,* McDonald v. Board of Election, 394 U.S. at 809, 89 S.Ct. 1404. Even under the less stringent standard, however, a court should look to the actual purpose of the statute and balance the importance of that goal and the means chosen

to attain it against the burden on the individual right.[9] Adoption of the less stringent standard should not lead to perfunctory acceptance of the statute's constitutionality.

The principal state interest which the statute protects is the prevention of fraudulent voting. Maintaining voter rolls that include persons who no longer reside in a precinct, or who reside there but do not vote, conduces to fraud. Pennsylvania discovered that political operatives knowledgeable of the status of such registrants and weaknesses in the system were able to cast votes in the non-voters' names. The two-year period allows removal of the names before the political operatives can take advantage of the situation. If the period were four years instead of two, they would have greater opportunity to seize upon the registrant's non-voting status and defeat the purpose of the purge. Such considerations led the state legislature to change the purge period from four to two years in 1941 after considerable public concern over voting fraud. Pub. L. No. 279, § 30 (July 31, 1941), [1941] Pa. Laws 710. Mr. Welsh testified that the change was prompted by a suit instituted in 1940 by the Committee of Seventy, charging fraud by "phantom voters."[10]

Recognition of the legislature's goal in enacting the two-year purge emphasizes that the state is interested in purging not just those registrants who have moved or died (39.8% of the purged registrants in the survey). The state is

---

8. The Pennsylvania legislature has liberalized its registration requirements so as to ease the burden on its voters. It abolished the annual registration requirements for voters in 1933. 25 P.S. § 222a. It established a permanent registration system in which the purge, originally on a four-year basis, was designed to keep the registration rolls clean and up to date and to minimize fraud. *Cf.* McDonald v. Board of Election, 394 U.S. 802, 809, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969).

9. *See,* Comment, The Constitutionality of Qualifying Fees for Political Candidates, 120 U.Pa.L.Rev. 109, 114–115 (1971);

Comment, The Parole System, 120 U.Pa. L.Rev. 282, 318–319 (1971).

10. The court takes judicial notice that on April 8, 1941, a Special Federal Grand Jury presentment found that there were 50,000 ineligible voters on the Philadelphia registration lists. Of course, voting fraud was not a new problem at the time the two-year purge was enacted. *See* Commonwealth v. Valverdi, 218 Pa. 7, 66 A. 877 (1907) (conviction for placing names of ineligible voters on voting lists) ; *cf.* In re Henry W. Zimmer, 33 Erie 132, 137 (1949).

also interested in those who have neither moved nor voted in two years and who fail to demonstrate a desire to continue their registration (38.5%).

The individual has a strong interest in exercising his right to vote without undue interference. The statute being challenged here does impose some burden on that right, but it is minimal. To prevent being removed from the rolls, a registrant must vote only once every two years or take some action to inform the Commission of his continued residence at the same location. That action can be as simple as returning the notice card with his signature or making a phone call. Moreover, the Commission will restore him to the rolls up to and including election day. The burden does not nearly approach the requirements of initial registration.

We have carefully evaluated the state interest in the maintenance of the two-year purge and its impact on an individual's exercise of the franchise. We are satisfied that the two-year purge bears a rational relationship to a legitimate state end. The legitimate state interest is the maintenance of up-to-date, reliable lists of qualified voters. Prevention of fraud, preservation of public confidence in the electoral process, and determination of the number of election workers to be employed are dependent upon such lists. The record discloses that at the time the legislature reduced the purge period to two years the danger of voting fraud was real and substantial, and that the legislature enacted the provision to combat that problem. This state interest is significant and the purge is closely related to its achievement. Preventing fraud and maintaining up-to-date, reliable registration lists is necessary to preserve the effectiveness of votes legitimately cast and outweighs the minimal burden on the individual's exercise of the franchise.[11] The Constitution does not preclude a

state, acting upon significant evidence of fraud, from requiring an individual either to vote or to inform the Commission of a desire to remain registered. We conclude, therefore, that Pennsylvania's purge provision is not unconstitutional.

LUONGO, District Judge (dissenting).

I dissent. The burdens placed upon voters by the two-year purge statute to obtain reinstatement are concededly not onerous, nevertheless, I conclude that the burden, light as it is, is not constitutionally permissible.

The Supreme Court has held that statutes placing restrictions on the right to vote can be sustained only upon a showing that they are necessary to promote a compelling state interest. City of Phoenix v. Kolodziejski, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970); Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969); Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). Certainly prevention of voter fraud is a compelling state interest. Where I part company with the majority is on the matter of whether there has been here demonstrated a relationship between voter fraud and failure to vote.

There is a surface validity to defendants' contention that the two-year purge statute provides a safeguard against "phantom" voters. The presence on a voter registration list of the names of persons no longer eligible to vote undoubtedly creates a potential for fraud, i.e. the possibility that evil persons with knowledge of the true facts may attempt to cast a "phantom" vote in the name and place of the non-existent voter. It also appears reasonable to assume (and we so noted in ruling on the preliminary injunction), that one who has failed to vote for two years is either no longer a resident, or if a resident, is no longer

---

11. Plaintiffs argue that the two-year purge affects most frequently those persons who wish only to vote in presidential election years. Even if that is true, we believe the minimal burden of giving notification to the registration commission is justified by the state interest.

interested in voting. The evidence presented, however, does not bear out those surface appearances. As noted in the majority opinion, the survey indicated that 58.5% of the persons in the sample stricken for non-voting were found to be actually still living at the place from which they had last voted. In 1971, approximately 11,000 persons responded to the first notice and an additional 2,000 responded to the second notice. If the numbers of those responding to the notices to strike were added to the projections from the survey it would appear that somewhat in excess of 64% of the persons to whom notices were sent for failure to vote still maintained the same residence. It is quite clear therefore that non-voting for two years is not a valid indicator of non-residence.

As for the inference of lack of interest, the evidence presented casts considerable doubt on that as well. The two-year non-vote purge produces approximately three times as many strike offs in the third year following a presidential election as there are in other years.[1]

1.

|  | 1967 | 1968 | 1969 | 1970 | 1971 |
|---|---|---|---|---|---|
| First notices | 94,000 | 35,000 | 31,000 | 33,000 | 92,000 |
| Second notices | 80,000 | 31,000 | 29,000 | 31,000 | 81,000 |

Williams v. Osser, supra, 326 F.Supp. at p. 1143.

---

The indication is quite clear, therefore, that many persons, a substantial number, exercise the right to vote only in presidential elections. I cannot say that such voters are "in fact substantially less interested." Kramer v. Union Free School District, supra, at 632, 89 S.Ct. 1886.

In my view the defendants have presented no evidence whatsoever of a relationship between vote fraud and non-voting. The majority has noted that "the two-year period allows removal of the names before the political operatives can take advantage of the situation." I am not aware of the factual basis for that statement and I disagree with the conclusion. It appears to me that if, indeed, a no longer eligible voter's name is used by a "phantom" to cast a fraudulent vote, that very fact will prevent disclosure of the fact of ineligibility through the non-vote purge provision. As to the majority's statement that "such considerations led the state legislature to change the purge period from four to two years in 1941 after considerable public concern over voting fraud," the only "evidence" I find in support of that is a statement by counsel for the defendants. There is no legislative finding, to my knowledge, in the statute itself or in any legislative history. The fact, of which the majority took judicial notice, that in 1941 a Special Grand Jury found that there were 50,000 ineligible voters on the Philadelphia registration lists does not cast any light on the relationship, if any, between non-voting and voter fraud, which is the issue before us.

In any event, even if evidence had been produced to establish that removal from the voting lists of the names of those who fail to vote for two years does tend to prevent voter fraud, the procedure does not accomplish the purpose with sufficient precision to justify denial of the right to vote to those who are still bona fide residents of the voting district. The survey of the sample of 491 persons reveals that the two-year non-vote purge identified only 144 persons (29.4%) who had moved, died or were otherwise not eligible to vote. From a projection of that information, it appears that 82,352 persons were stricken from the voter registration list by the two-year purge statute in order to effect the removal of only 24,210 who

were no longer eligible to vote, a ratio of about 3½ to 1. Such a procedure is too sweeping and does not conform to the exacting standard of precision required of statutes which selectively distribute the franchise. Kramer v. Union Free School District, *supra*; see Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967). At best, it should serve only as a basis for further investigation through the other statutory means available (e.g. 25 P.S. § 623–31 (Official Report); § 623–32 (Mail Canvass); § 623–33 (Inspectors' Canvass); § 623–35 (Strike-off Petition)) to ascertain whether, in fact, the voter is no longer eligible by non-residence or otherwise.

I would hold that the two-year non-vote purge provision (25 P.S. § 623–40) of "The First Class City Permanent Registration Act" of Pennsylvania is unconstitutional as imposing an unnecessary burden on the right to vote.