Thomas M. HOFFMAN, et al.

v.

STATE OF MARYLAND, et al.

Civ. No. K–90–669.

United States District Court,
D. Maryland.

April 17, 1990.

John H. Morris, Jr., Michael H. Davis, Mitchell Merviss, Charles G. Byrd, Jr., Gregory A. Cross, Kathleen McDermott and Susan Goering, American Civil Liberties Union of Maryland, Baltimore, Md., for plaintiffs.

J. Joseph Curran, Jr., Atty. Gen. of Maryland, and Jack Schwartz and Andrew Baida, Asst. Attys. Gen. of Md., Baltimore, Md., for defendants.

Deborah H. Karpatkin, New York City, for amicus curiae 100% VOTE: The Campaign for Universal Voter Registration.

FRANK A. KAUFMAN, Senior District Judge.

Plaintiffs Thomas Hoffman and Timothy Ulrich are citizens of the State of Maryland and residents of Baltimore City. Both are currently registered to vote in Baltimore City.[1] Defendants are the State of Maryland; the Maryland State Administrative Board of Elections (State Board), an agency of the State of Maryland; the individual members of the State Board in their official capacities; the Baltimore City Board of Supervisors of Elections (City Board), an agency of the State of Maryland; and the individual members of the City Board in their official capacities. Pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983, plaintiffs seek declaratory and injunctive relief from the operation and application of Md.Ann.Code art. 33, § 3–20 (1986 Repl. Vol.), which requires that all voters who have not voted for a period of five years be removed from the list of registered voters. Subject matter jurisdiction is present under 28 U.S.C. § 1343.[2]

## FACTS

As provided by Md.Ann.Code art. 33, § 3–20, the City Board has compiled a list of registered voters in Baltimore City who have not voted in any primary, general or special election since November 6, 1984. That list contains the names of approximately 55,000 individuals. The City Board intends to mail, on or after 5:00 p.m. on April 16, 1990, to persons whose names appear on that list notice of the cancellation of their registration and the removal of their names from the registry of voters. Thereafter, in accordance with section 3–20, the City Board plans to proceed to remove from the registry of voters all persons who have not, in response to the mailed notice, demonstrated that they have, in fact, voted within the aforementioned five-year period. Those persons whose names are removed from the registry as a result of their failure to vote in any election during the preceding five years will be afforded the opportunity to re-register as provided by article 33 of the Maryland Code.

Plaintiffs Hoffman and Ulrich currently are registered voters residing in Baltimore City. Their names are on the list of voters to be so removed. Neither of them desires to have his name removed. Each alleges, *inter alia,* that he intended his nonvoting to convey the communication that he did not, during the time period in question, support the candidacy of any person seeking office and that he had heard no mes-

1. Originally, plaintiffs sought to be named as class representatives pursuant to Fed.R.Civ.P. 23(b)(2). However, because, without class certification, the equitable relief which plaintiffs seek would have benefited all persons similarly situated as well as the individual plaintiffs, plaintiffs were permitted by this Court, after appropriate public notice and opportunity to putative class members to be heard, *see Shelton v. Pargo,* 582 F.2d 1298 (4th Cir.1978), to drop their request for class certification. Also, originally, plaintiffs asked for an order of this Court restraining defendants, prior to this Court's decision in this case, from acting pursuant to the within challenged purging statute. That quest, however, was mooted by agreement of defendants not so to act on or before April 16, 1990, and by agreement between the parties, with the approval of this Court, for submission of this case for decision by the Court as to both facts and law on the basis of a lengthy stipulation and written documents without the presentation of any live testimony, and after oral argument during a proceeding on April 12, 1990. At the conclusion of that proceeding, this Court announced its decision in open Court on the record and stated that it would file this opinion as promptly as possible.

2. Defendants, raising the bar of the Eleventh Amendment, seek dismissal of the complaint against defendants State of Maryland, the State Board and the City Board. The latter, though so generally called, is in fact an agency of the State of Maryland, as is the State Board. Plaintiffs do not resist such dismissal. *See Clegg v. Slater,* 420 F.Supp. 910, 912 (W.D.Okla.1976). The other defendants do not raise the Eleventh Amendment bar. Nor can they meritoriously so do since that Amendment does not prevent suits against persons acting in their official capacities seeking to restrain such officials from violating the Constitution of the United States. *See Cory v. White,* 457 U.S. 85, 89, 102 S.Ct. 2325, 2328, 72 L.Ed.2d 694 (1982); *see generally* 13 C. White, A. Miller and Cooper, *Federal Practice and Procedure* § 3524 at 121–60 (1984).

sage during any of the election debates during that period which reflected his views.[3] According to Hoffman and Ulrich, by their refusals to vote in any given election, they in fact participate therein. Specifically, they each assert that such nonvoting is reflected in the difference between a 100% voter turn-out and the officially reported percentage of voters who cast ballots, and is in that way made publicly known. To be reflected in that negative tally, plaintiffs point out that a person must be both a registered voter and be recorded as not having voted. Once removed from the list of registered voters, a person, until re-registration, is ineligible from voting, from being so counted as nonvoting, from serving on juries, and from signing petitions for candidates or petitions for referendums.

## LAW

■ Plaintiffs contend that Maryland's five-year purge statute violates the First and Fourteenth Amendments of the Constitution of the United States by restricting their rights to vote and/or not to vote, by contravening equal protection principles and by burdening freedom of speech. In so asserting, plaintiffs rely, *inter alia,* upon *Dixon v. Maryland State Administrative Election Laws,* 878 F.2d 776 (4th Cir.1989), in which Judge Winter held that the State's failure to announce the total of write-in votes closed off an avenue for dissident expression, and wrote:

[A] vote does not lose its constitutional significance merely because it is cast for a candidate who has little or no chance of winning. Nor do we think it loses this

character if cast for a non-existent or fictional person, for surely the right to vote for the candidate of one's choice includes the right to say that no candidate is acceptable....

... Indeed, in many cases write-in voters may be backing persons who are not even running for office, in effect expressing the comment "A plague o' both your houses." Such dissident voters are no doubt aware that, as efforts to achieve the actual election of their favorites, their votes probably will be without effect. Nonetheless, these voters cast their ballots as they do, in the hope, however slim, that their votes will succeed as efforts to propagate their views, and so increase their influence. Our system of government accords the expression of this hope the status of a protected right.

The State's failure to report these votes closes off this avenue for dissident expression.

*Id.* at 782 (footnotes omitted). The right not to vote—and to have one's nonvote recorded—must be viewed in the same light. In that context, the right to vote includes the right not to vote. Nevertheless, plaintiffs' within voting rights, equal protection and free speech claims may not prevail because, to the extent that the Maryland statute restricts the rights of a registrant, it does so on a minimal basis and for a purpose which is rationally related to the interests of the State of Maryland in providing appropriate standards to govern election procedures.[4] If a person has not voted for five years and receives notice from an election board that his or her name

---

3. The parties have stipulated:

The registered voters in the general population choose not to vote for a variety of reasons, including dissatisfaction with the choice of particular candidates presented, general mistrust of the elective process as a means of addressing and resolving problems of importance to the various voters, the absence of candidates or issues inspiring public excitement or interest, inconvenience, lack of transportation, or lack of knowledge concerning how to go about voting.

4. The constitutional right of a citizen to vote has long been recognized. *See Dunn v. Blumstein,*

405 U.S. 330, 336–37, 92 S.Ct. 995, 999–1000, 31 L.Ed.2d 274 (1972). However, such right is subject to the imposition of appropriate state standards. *See id. See also Lassiter v. Northampton County Bd. of Elections,* 360 U.S. 45, 50–51, 79 S.Ct. 985, 989–90, 3 L.Ed.2d 1072 (1959). *And see Anderson v. Celebrezze,* 460 U.S. 780, 788, 103 S.Ct. 1564, 1569–70, 75 L.Ed.2d 547 and n. 9 (1983) (citing cases which recognize that although the right to vote is fundamental, not all state restrictions designed to regulate the electoral process "impose constitutionally suspect burdens on voters' rights").

will be removed from the voter registration list unless the person can demonstrate that he or she has voted within the five-year period, that person then has the opportunity forthwith to re-register under rather easily usable state procedures. *Cf. Bradley v. Mandel*, 449 F.Supp. 983, 987 (D.Md. 1978) (three-judge court). The State's central purpose for the five-year purge statute is to prevent fraud by persons voting under the names of deceased voters or voters who have moved out of the State. That is an appropriate reason. *See Rosario v. Rockefeller*, 410 U.S. 752, 761, 93 S.Ct. 1245, 1251–52, 36 L.Ed.2d 1 (1973) ("preservation of the integrity of the electoral process is a legitimate and valid State goal"). While plaintiffs assert that there are means less restrictive than those used in the challenged Maryland statute and while some states do utilize somewhat different procedures, the Maryland procedures for registration are sufficiently simple that a person who has not voted within a five-year period can re-register, in effect, with less difficulty and time consumption than is true with regard to most persons who exercise their rights to vote and go to the polls, even if they do not have to stand in line before voting.[5]

While in cases challenging state statutes which totally restrict the right to vote, such as *Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), in which the challenged statute absolutely barred from voting anyone who moved into the state less than one year before the close of registration, the Supreme Court has applied a strict scrutiny type of standard and has required the existence of a "compelling" state interest. *See also Hill v. Stone*, 421 U.S. 289, 95 S.Ct. 1637, 44 L.Ed.2d 172 (1975); *Muller v. Curran*, 889 F.2d 54, 56–57 (4th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1121, 107 L.Ed.2d 1027 (1990); *Hayward v. Clay*, 573 F.2d 187 (4th Cir.1978), *cert. denied,* 439 U.S. 959, 99 S.Ct. 363, 58 L.Ed.2d 351 (1978), which involved state statutes which effectively disenfranchised all potential voters who did not own property. This case, on the other hand, like *Duprey v. Anderson*, 518 P.2d 807, 809 (D.Colo.1974), involves a purging statute with opportunity for re-registration. Herein, the statute involved contains no absolute restriction on voting; rather, it simply requires re-registration under a procedure which is not burdensome to follow. *See Broadwater v. State*, 306 Md. 597, 605, 510 A.2d 583 (1986) (referring to "the ease with which one may register under the current law").

In cases in which plaintiffs similarly situated to plaintiffs have challenged purge-type standards on the basis of unconstitutional burdening of the right to vote, those challenges, except in one case,[6] have failed.

---

**5.** Maryland could, of course, if it desired, adopt a procedure of notifying each registrant who had not voted for five years that the registrant's name would be removed unless the registrant notified the election officials in writing of the registrant's desire to have his or her name remain on the list. But plaintiffs, in oral argument, while indicating a possible preference for that procedure over the challenged procedure set forth in Md.Ann.Code art. 33, § 3–20, contend that the State itself, in order not to violate federal constitutional principles, must ascertain that a registrant is dead or has moved out of Maryland and otherwise should not remove him from the list. That latter procedure, as opposed to the procedure under attack in this case, may well bring about greater registration—surely a desirable result. But the determination of what is the best way to administer voter registration so as to achieve such an aim and at the same time minimize election fraud is for Maryland's legislature, and does not in this Court's view pose a federal constitutional issue within the province of a federal court, unless one or more constitutional rights of persons such as plaintiffs are overburdened—which is not the result herein.

**6.** *See Michigan State UAW Community Action Program Council v. Austin*, 387 Mich. 506, 198 N.W.2d 385 (1972), holding that a statute which provided for suspension of registration of all voters who have not voted or taken other specified action within two years was not supported by a compelling state interest, and thus violated the Michigan Constitution by imposing a further qualification for voting in addition to those provided for under that State's Constitution. While *Austin* did not reach *federal* constitutional issues, the Supreme Court of Michigan relied on decisions of the Supreme Court of the United States in rendering its decision.

It is to be noted that an approach similar to that of the Supreme Court of Michigan is taken by Judge Luongo in his dissenting opinion in *Williams v. Osser*, 350 F.Supp. 646, 653, *et seq.* (E.D.Pa.1972) (three-judge court, majority opinion by Judge Rosenn).

*Williams v. Osser,* 350 F.Supp. 646, 653 (E.D.Pa.1972) (three-judge court); *Citizens' Committee for the Recall of Jack Williams v. Marston,* 109 Ariz. 188, 507 P.2d 113, 116 (1973); *Duprey,* 518 P.2d at 809. In those cases, while the right to vote has been recognized as a fundamental constitutional right, nevertheless, the courts have concluded that the right is not absolute and that it is not overburdened by the type of statute herein involved. In *Williams v. Osser,* a three-judge court sustained the constitutionality of a Pennsylvania law which provided "for removal from the voter registration lists of persons who have not voted at any election or primary during the two immediately preceding calendar years and who, after notice, have failed to request reinstatement of registration...." 350 F.Supp. at 647. Plaintiffs in *Osser* claimed that the two-year purge statute "places an unconstitutional burden on the fundamental right to vote," and that the provision "violates the equal protection clause by singling out for separate treatment those who have not voted for two consecutive calendar years." *Id.* at 648 (footnote omitted). Pennsylvania election officials argued, and the Court agreed, that "the two-year purge serves a legitimate state interest because it protects the electoral process against election fraud by providing a safeguard against 'phantom' voters." *Id.* at 650. Judge Rosenn, writing for the majority, explained:

The principal state interest which the statute protects is the prevention of fraudulent voting. Maintaining voter rolls that include persons who no longer reside in a precinct, or who reside there but do not vote, conduces to fraud....

. . . .

... Preventing fraud and maintaining up-to-date, reliable registration lists is necessary to preserve the effectiveness of votes legitimately cast and outweighs the minimal burden on the individual's exercise of the franchise.

*Id.* at 652–53 (footnotes omitted). In *Osser,* Judge Rosenn declined to subject the two-year purge provision to a "compelling state interest" standard, as Judge Luongo advocated in dissent (*id.* at 653), but rather opted for the "reasonable basis" test (*id.* at 650), because the statute created no suspect classification, disenfranchised no political group, and did not absolutely bar any voter from casting an effective vote. *Id.* at 651. Applying the rational basis standard, Judge Rosenn wrote that the Constitution required the Court to "look to the actual purpose of the statute and balance the importance of that goal and the means chosen to attain it against the burden on the individual right." *Id.* at 652 (footnote omitted). So doing, Judge Rosenn concluded that while the statute being challenged did impose a burden on the right to vote, that burden was "minimal." *Id.* at 653. Outweighing that minimal burden was the statute's relationship to a legitimate state end. *Id.*

■ Insofar as attacks on such statutes on equal protection principles are concerned, they have likewise failed for the type of reasons indicated *supra* with relationship to the burdening of the right to vote. That is, the different treatment afforded to persons who do not vote for a specified period of time is reasonably and rationally related to a legitimate state aim and, therefore, does not offend equal protection principles any more than it impermissibly burdens the right to vote. *See Osser,* 350 F.Supp. at 653; *Marston,* 507 P.2d at 116; *Duprey,* 518 P.2d at 809.

■ Insofar as the right of free speech is concerned,[7] the record in this case, as indicated *supra,* demonstrates that no one can be certain exactly why a person who does not vote has determined to stay away from the polls. The message, therefore, that one perceives from another person who has stayed away from the polls is

7. Plaintiffs in this case have, as has seemingly not occurred in other reported cases involving voter-purging statutes, stressed free speech contentions as constituting constitutional violation separate and apart from right to vote and equal protection violations. For the reasons stated

*infra* in the body of this opinion, plaintiffs' free speech claims fail essentially for the same reasons as do their other contentions, although the analysis applicable in the free speech context is, in the light of Supreme Court precedent, slightly different.

somewhat ambiguous. However, in any event, it does involve a combination of elements of "speech" and "nonspeech." *United States v. O'Brien,* 391 U.S. 367, 376, 88 S.Ct. 1673, 1678–79, 20 L.Ed.2d 672 (1968). When those two types of "elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *Id.* In *O'Brien,* in which the Supreme Court upheld a federal statute making criminal the knowing destruction or mutilation of a selective service registration card, Chief Justice Warren wrote that, under such circumstances,

> a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Id.* at 377, 88 S.Ct. at 1679. Those standards have been recently referred to by the Supreme Court in *Texas v. Johnson,* 491 U.S. ——, ——, 109 S.Ct. 2533, 2538, 105 L.Ed.2d 342, 352 (1989). In that case, in which the conviction of a protestor for burning the American flag was held to violate the First Amendment, Justice Brennan noted:

> If the State's regulation is not related to expression, then the less stringent standard we announced in *United States v. O'Brien* for regulations of noncommunicative conduct controls. *See O'Brien, supra* [391 U.S.], at 377 [88 S.Ct. at 1679]. If it is, then we are outside of *O'Brien*'s test, and we must ask wheth-

er this interest justifies Johnson's conviction under a more demanding standard. *Id.* (footnote omitted). Justice Brennan also wrote: "The Government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word. It may not, however, proscribe particular conduct *because* it has expressive elements." *Id.* 491 U.S. at ——, 109 S.Ct. at 2540, 105 L.Ed.2d at 354–55 (citations omitted) (emphasis in original).

In this case, in which, as in *O'Brien,* there is a mixture of speech and nonspeech, the less demanding standard enunciated in *O'Brien* applies.[8] Plaintiffs have not alleged, and the record does not suggest, that section 3–20 purges nonvoters as a means of, or with a view to, suppressing any political expression which such persons intend to convey by their failure to vote.

In *Burns v. Fortson,* 410 U.S. 686, 686–87, 93 S.Ct. 1209, 1209–10, 35 L.Ed.2d 633 (1973), in a per curiam opinion, the Supreme Court recognized the State's interest in maintaining reliable, up-to-date registration lists as a means of promoting "the orderly, accurate, and efficient administration of state and local elections, free from fraud" and, therefore, sustained a Georgia statute providing for the closing, in certain instances, of the registration rolls 50 days before general elections, even though that "period approaches the outer constitutional limits." *Id.* at 687, 93 S.Ct. at 1210. In so doing, the Court, quoted from *Marston v. Lewis,* 410 U.S. 679, 681, 93 S.Ct. 1211, 1212–13, 35 L.Ed.2d 627 (1973), involving an Arizona voting-control statute, as follows:

> In the present case, we are confronted with a recent and amply justifiable legislative judgment that 50 days rather than 30 is necessary to promote the State's important interest in accurate voter lists. The Constitution is not so rigid that that

---

**8.** In *Johnson,* 491 U.S. at ——, 109 S.Ct. at 2540–41, 105 L.Ed.2d at 355, Justice Brennan stated "that *O'Brien's* test 'in the last analysis is little, if any, different from the standard applied to time, place, or manner restrictions,'" quoting *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 298, 104 S.Ct. 3065, 3071, 82 L.Ed.2d 221 (1984). *See Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47, 106 S.Ct. 925, 928,

89 L.Ed.2d 29 (1986), for a recent application by the Supreme Court of the "so-called 'content neutral' time, place and manner regulations." In *Renton,* Chief Justice Rehnquist stated that such "regulations are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." *Id.*

determination and others like it may not stand.

*Id.*

██ In that light, Maryland's legislative determination of its interest in maintaining "up-to-date reliable lists of qualified voters" so as to prevent fraud and preserve "public confidence in the electoral process" is "significant and the purge is closely related to its achievement." *Williams v. Osser,* 350 F.Supp. at 653. Nor does the Maryland statute challenged herein unnecessarily restrict freedom of expression, or "unreasonably limit alternative avenues of communication," *Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47, 106 S.Ct. 925, 928, 89 L.Ed.2d 29 (1986), since nothing prevents qualified voters whose names are purged from the voter registry from re-registering and thereafter expressing political communication by either voting or not voting. *See Marston,* 507 P.2d at 116; *Duprey,* 518 P.2d at 809–10.

Accordingly, Md.Ann.Code art. 33, § 3–20 does not offend the constitutional rights of plaintiffs to vote, or not to vote, or equal protection principles, or the exercise of plaintiffs' rights of free speech. Therefore, the individual defendants are entitled to judgments in their favor and those judgments have been entered.[9]

---

**9.** Plaintiffs' complaint against the nonindividual defendants has been dismissed, and judgments in favor of the nonindividual defendants have been entered for Eleventh Amendment reasons. *See* notes 1 and 2, *supra.*